**PEOPLE UNITED TO SAVE HOMES, Petitioner,**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION and Eighty-four Mining Company, Respondents.**

**Eighty–Four Mining Company, Petitioner,**

v.

**Department of Environmental Protection and People United to Save Homes, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2001.

Decided Nov. 21, 2001.

Robert P. Ging, Jr., Confluence, for petitioner, People United to Save Homes.

Michael J. Heilman, Pittsburgh, for respondent, DEP.

Thomas C. Reed, Pittsburgh, for respondent, Eighty-four Mining Co.

Before PELLEGRINI, J.,
LEADBETTER, J. (P.), and
JIULIANTE, Senior Judge.

PELLEGRINI, Judge.

Before us for consideration are two petitions for review consolidated for argument.[1] First, People United to Save Homes (PUSH)[2] petitions for review of an order of the Environmental Hearing Board (EHB) dismissing its appeal and affirming the Department of Environmental Protection's (Department) issuance of a permit revision to Eighty–Four Mining Company (84 Mining). Additionally, 84 Mining petitions for review of that same order in which the EHB sustained PUSH's appeal as to the adequacy of its subsidence bond and required the Department to recalculate its subsidence bond.[3]

The action that ultimately led to this appeal began on October 24, 1994, when 84 Mining[4] filed an application for revision of its Coal Mining Activity Permit No. 63831302 (coal permit) with the Department. In its application, 84 Mining sought to add underground acreage to the mine permits and five-year subsidence control plan areas for a longwall mine it operates in Washington County.[5] Following a review of the application, the Department approved 84 Mining's application on September 22, 1995. Making over 245 allegations as to why the permit was issued in error, PUSH appealed that determination to the EHB.[6]

Concluding, *inter alia*, that the Department properly conducted the compliance review of 84 Mining's permit revision application and that review showed no presumptive evidence of potential pollution to

1. By order dated August 28, 2000, the petitions for review at No. 1855 C.D.2000 and No.1938 C.D.2000 were consolidated for our review.

2. PUSH is an unincorporated association representing property owners within the boundary of a subsidence control plan for a coal mining activity permit issued to 84 Mining.

3. The EHB's order sustained PUSH's appeal with regard to the adequacy of the subsidence bond approved by DEP and remanded the matter to DEP to calculate an appropriate subsidence bond. By Order dated August 28, 2000, the EHB approved a stipulation entered into by the Department and 84 Mining relating to the recalculated bond. Following entry of the EHB's August 28, 2000 Order, the July 2, 1999 Order became final.

4. 84 Mining purchased Mine 84 from BethEnergy Mines, Inc. in 1992 at a time when the mine was idle.

5. Specifically, 84 Mining proposed to add 1,955 acres to its underground permit area and 5,340 acres to its subsidence control plan boundary.

6. In addition to PUSH, Columbia Gas of Pennsylvania, Inc., Pennsylvania American Water Company and the Township of South Strabane initially appealed the Department's approval of 84 Mining's revision application; however, only PUSH has filed a petition for review before us.

the waters of the Commonwealth; that although the Department's written findings regarding its review of the application did not mirror the language of the regulations, the Department's review was in accordance with the standard set forth in the regulations; and the revision permit application complied with the regulations requiring an applicant to describe how affected water supplies would be replaced, the EHB held that the Department did not abuse its discretion in approving 84 Mining's permit revision. However, concluding that the Department's approval of a subsidence bond in the amount of $10,000 was arbitrary and capricious under the facts of the case, the EHB sustained PUSH's appeal as to that issue and remanded the matter to the Department to calculate an appropriate bond in accordance with the provisions of the Subsidence Act and the regulations.

## I.

### LONGWALL MINING

In 1994, 84 Mining was formed for the purpose of developing Mine 84 into a modern state-of-the-art longwall coal mine. "Longwall system" is defined as "a method of coal mining in which the working face extends entirely across the seam, the work proceeds either away from or toward the main shaft, and the roof is allowed to cave in behind the workers." Webster's Third New International Dictionary 1334 (1993). The technique removes coal from a panel which may be from 400 to 1,000 feet along the face, and from 1,000 to 10,000 feet long without leaving pillars to support the mine roof as was done in the conventional room-and-pillar mining method. It is a highly mechanized system consisting of three

principal components: a shearer or plow which cuts the coal as it moves across the face; a chain-type armored face conveyor to remove the coal from the face once it is cut; and a system of self-advancing hydraulic roof supports which support the roof as the shearer makes its cut and then allows the roof to collapse behind the mining. Joshua I. Barrett, *Longwall Mining and SMCRA: Unstable Ground for Regulators and Litigants*, 94 W.Va.L.Rev. 693 (1992).

■ The longwall method is generally favored by the industry because it results in an extremely high recovery rate at a relatively low cost. It also requires fewer employees than the room-and-pillar method and is considered to be relatively safer. *Id.* Moreover, longwall mining is an accepted method of underground mining which was contemplated by both federal and state mining regulations. *See George v. Department of Environmental Resources*, 102 Pa.Cmwlth. 87, 517 A.2d 578 (1986). However, the major drawback to the longwall method is that as practiced today, it causes subsidence of the surface overlying and in the vicinity of the panel, and often results in the loss of or damage to natural water sources.[7]

Coal mine subsidence is the lowering of strata overlying a coal mine, including the surface, caused by the extraction of underground coal. *See Keystone Bituminous Coal Association v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The lowering of the strata often causes substantial damage to foundations, walls and other structural components and the integrity of houses and buildings; it often causes sinkholes or troughs in land impeding development of those areas as well as

7. Pennsylvania has long recognized three separate estates in land—surface, coal and the right to support. *Machipongo Land and Coal Company, Inc. v. Department of Environmental Resources,* 719 A.2d 19 (Pa.Cmwlth.1998).

loss of groundwater supplies and surface ponds. *Id.*

In an effort to lessen the devastating effects of underground mine subsidence on private citizens and homeowners, in 1966, the General Assembly enacted the Bituminous Mine Subsidence and Conservation Act (Subsidence Act), Act of April 27, 1966, Sp. Sess. P.L. 31, *as amended,* 52 P.S. § 1406.1—1406.21. Following the 1966 enactment, coal mining companies, regardless of their common law rights that would have allowed them to remove surface support, were required to prevent subsidence damage to a limited class of surface structures as enumerated in Section 4 of the Act, which included structures existing as of the enactment date, including: (1) any public building or non-commercial structure customarily used by the public, including but not limited to schools, hospitals, churches, municipal utilities or municipal public service operations; (2) dwellings used for human habitation; and (3) cemeteries. The Subsidence Act, however, did not provide any protection to homes built after April 27, 1966, nor did it require that coal mining companies repair or compensate such homeowners for damage to their homes; it only required that coal mining companies provide six months notice of intended undermining and give homeowners the ability to purchase coal support from the coal mining companies.

In 1980, in response to the passage of the Federal Surface Coal Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1201–1328, the General Assembly amended the Subsidence Act.[8] The 1980 amendments included significant amendments to the Subsidence Act such as: (1) amending Section 4 to allow mining beneath protected structures provided that the current surface owners consented to such mining; (2) adding provisions to Section 5 requiring the submission of information on compliance history, requiring public participation in the permit process and adding the language of Section 5(e) which required a coal mine operator to adopt measures to prevent subsidence-causing material damage to the extent technologically and economically feasible; and (3) adding Section 7(b) which gave the Department the authority to promulgate regulations. However, the 1980 amendments still did not provide any additional protections to individual homeowners whose homes were built after April 27, 1966.

In response to various proposed amendments submitted by members of the coal mining industry and special interests who believed that the 50% mining policy applied to all Section 4 protected structures greatly impeded the development of longwall coal mining, the General Assembly again substantially amended the Subsidence Act in 1994 through Act 54.[9] Act 54 repealed Sections 4, 6(a) and 15 of the Subsidence Act, sections which prohibited coal companies from damaging certain structures, required that mining companies repair damage to protected structures, and gave the owners of non-Section

---

**8.** The Federal SMCRA regulates both surface mining and underground mining. It contains specific statutory requirements which allow the grant of primary jurisdiction (primacy) to the states to regulate coal mining within their borders. 30 U.S.C. § 1253; 39 C.F.R. § 730. In order to obtain primacy, a state must submit a state program of laws and regulations for approval by the federal government. The state program must be consistent with the Federal SMCRA. Even after assigning primacy to a state, the federal government retains oversight authority of mining regulation. Shortly after the enactment of the federal SMCRA in 1977, Pennsylvania moved to obtain primacy over it coal mining regulations.

**9.** Act of June 22, 1994, P.L. 357.

4 or unprotected structures the right to purchase coal support.

Act 54 eliminated the distinction between pre–1966 and post–1966 homes and treated all homes equally under the Subsidence Act. Coal mining companies were required to adopt measures that would prevent material damage to surface structures to the extent technologically and economically feasible, and if mining were to result in irreparable damage, the Department could prohibit such mining. *See* 52 P.S. § 1406.9a(b). Act 54 also required coal mining companies to repair or compensate all homeowners for any subsidence damage to their homes caused by the mining activities of those companies. Also under Act 54, for the first time, a coal mining company was required to replace or restore any water supply which was adversely affected by its mining operations. 52 P.S. § 1406.5b. It also established that certain structures, including public buildings and facilities, churches, schools, hospitals, impoundments with a storage capacity of 20 acre-feet or more and bodies of water with a volume of 20 acre-feet or more, had to be protected from material damage. 52 P.S. § 1409a(c).

## II.

### A.

Initially, PUSH contends that the Department inappropriately exercised its power of eminent domain when it issued the mining permit to 84 Mining. It argues that in issuing that permit, the Department authorized 84 Mining to damage private property to the detriment of the public interest and such action constituted an unconstitutional taking. PUSH also argues that the Subsidence Act violates property owners' dues process rights because it does not guarantee that a property owner will be fully compensated for all of the damage to his home caused by a coal mining company's mining activities and does not guarantee sufficient replacement of their water resources damaged by mining activities.

### 1.

■ The Department and 84 Mining (collectively, Respondents), however, argue that PUSH's constitutional claims were waived because they were never properly raised before the EHB. Subchapter C of Chapter 21 of 25 Pa.Code provides rules of procedure before the EHB. Specifically, 25 Pa.Code § 1021.51, relating to commencement, form and content of appeals, provides, in relevant part:

> The appeal shall set forth in separate numbered paragraphs the *specific objections to the action of the Department.* The objections may be factual or legal. An objection not raised by the appeal or an amendment thereto under § 1021.53 (relating to amendments to appeal; nunc pro tunc appeals) shall be deemed waived, provided that, upon good cause shown, the Board may agree to hear the objection. For the purpose of this subsection, good cause shall include the necessity for determining through discovery the basis of the action from which the appeal is taken.

25 Pa.Code § 1021.51(e). (Emphasis added). Failure to file specific grounds for appeal within the 30 day period for appeals is a defect going to jurisdiction of the EHB. *Pennsylvania Game Commission v. Department of Environmental Resources,* 97 Pa.Cmwlth. 78, 509 A.2d 877 (1986), *aff'd on other grounds,* 521 Pa. 121, 555 A.2d 812 (1989).

Relying on our decision in *Croner, Inc. v. Department of Environmental Resources,* 139 Pa.Cmwlth. 43, 589 A.2d 1183 (1991), PUSH contends that it sufficiently raised its constitutional challenges to the

Department's issuance of the coal mining permit in its Attachment To Notice of Appeal before the EHB where it stated "3. The issuance of the Revision Approval to Mining Activity Permit No. 63831302 is appealed for the following reasons: ... f. The action is unconstitutional."

■ The issue then is what does "specific objections" to an action of the Department mean, and can it be, as here, just saying the action is unconstitutional or does the objection need to say more such as why the action is unconstitutional and what provision of which constitution is being violated.[10] In *Croner*, we reversed the EHB's conclusion that a party's challenge to a particular regulation as assertedly violative of a statute was waived because it was not raised in the notice of appeal, stating:

> Additionally, although the board concluded that Croner failed to raise the issue of whether 25 Pa.Code § 87.127 violated 52 P.S. § 1396.4b(c), we note that Croner's notice of appeal, filed with the board, did raise, in general terms, the issue of compliance with authority given by law, by stating that '[t]he action of the Commonwealth of Pennsylvania, Department of Environmental Resources, in conditioning Appellant's mine drainage permit to these conditions, is

otherwise contrary to law and in violation of the rights of Appellant.'

*Croner*, 589 at 1187. We do recognize that since *Croner*, decisional law in other areas requires more specificity, *see e.g. J. Sheppard Stables v. Workers' Compensation Appeal Board (Wyatt)*, 739 A.2d 1084 (Pa. Cmwlth.1999); however, because under our holding in *Croner*, PUSH's notice of appeal was sufficient to raise its constitutional challenges, we will address the merits of those issues.

**2.**

■ Under both the Fifth Amendment to the United States Constitution [11] and Article 1, Section 10 of the Pennsylvania Constitution,[12] a taking of private property is unconstitutional without payment of just compensation. A taking occurs when the entity clothed with the power substantially deprives an owner of the use and enjoyment of his property. *Machipongo*. A taking may also occur if a regulation enacted for a public purpose under the government's police powers prevents the landowner from using his land. *Id.* In order to establish that a taking for which compensation must be paid has occurred, a property owner must establish that his/her property right has been affected.[13] *See Tri–State Transfer Company, Inc. v. De-*

---

10. Although raised by the Department and 84 Mining that PUSH's constitutional challenges were not properly raised before the EHB, the EHB did not address that issue.

11. The Fifth Amendment to the United States Constitution states, in relevant part: "nor shall private property be taken for public use, without just compensation."

12. Article 1, Section 10 of the Pennsylvania Constitution provides, in relevant part: "nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."

13. The test to determine whether a regulatory taking has occurred is based on the following factors: (1) whether the public interest requires regulatory interference with the property right; (2) whether the regulation is reasonably related to that goal; (3) whether the amount of property taken deprives an owner of all economically viable uses of the property, measured by what was taken against what was left; and (4) whether property owner's actions or proposed actions would cause a nuisance. *Machipongo*.

*partment of Environmental Protection,* 722 A.2d 1129 (Pa.Cmwlth.1999).

 In this case, PUSH does not allege that any specific property right has been taken, i.e., it does not allege anyone's estate in the right to support or any other "traditional" property right has been taken. What it seems to be contending is that in issuing the permit revision to 84 Mining to allow longwall mining, the Department's approval results in subsidence of home owners' properties which is an unconstitutional taking, even though it admits, absent the Subsidence Act, the home owners have no property rights to surface support. What PUSH's argument overlooks is that the Subsidence Act is an exercise of the General Assembly's police powers. Police power legislation promotes the *public* welfare and provides no one individual with a "vested" right or any "property rights" cognizable under the takings clause. *See e.g. Domiano v. Department of Environmental Resources,* 713 A.2d 713 (Pa.Cmwlth.1998).[14] Because there is no property right afforded to a homeowner merely through the Department's exercise of its police power and the Subsidence Act, no taking under either the United States or Pennsylvania Constitution could have occurred under PUSH's theory.

 Similarly, as to PUSH's due process argument that the Subsidence Act is unconstitutional because it does not provide a property owner with full compensation for damage caused by mining activities, the Fourteenth Amendment to the United States Constitution[15] and Article 1, Section 1 of the Pennsylvania Constitution[16] provide that no person shall be deprived of life, liberty or property without due process of law. Assuming that it does · not provide full compensation, the Subsidence Act as a police power regulation of longwall mining activity requires coal mining companies to protect property owners even absent cognizable property rights. As in a takings argument, in order to properly raise a violation of due process, one must establish that a property right has been affected, *see Pipkin v. Pennsylvania State Police,* 548 Pa. 1, 693 A.2d 190 (1997), and arguing that one is entitled to receive more than the legislation provides, even though one has no property right of any kind, is not a cognizable takings claim. Because PUSH has failed to allege that any property right has been affected, its due process argument must also fail.

**B.**

PUSH also contends that the EHB erred in finding that 84 Mining's revision application demonstrated that 84 Mining adopted measures to prevent subsidence that would cause material damage to the extent technologically and economically feasible as required by Section 5(e) of the

---

14. Similarly, under the public duty doctrine, there is no duty owed to a particular person by a municipality or other governmental body absent a special relationship. *See Thomas v. City of Philadelphia,* 133 Pa.Cmwlth. 121, 574 A.2d 1205, *petition for allowance of appeal denied,* 527 Pa. 659, 593 A.2d 429 (1990).

15. The Fourteenth Amendment to the United States Constitution provides, in relevant part, "nor shall any State deprive any person of life, liberty, or property, without due process of law."

16. Article 1, Section 1 of the Pennsylvania Constitution provides:

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Subsidence Act. Section 5(e) of the Subsidence Act, 52 P.S. § 1406.5(e), provides:

> An operator of a coal mine subject to the provisions of this act shall adopt measures and shall describe to the department in his permit application measures that he will adopt to prevent subsidence causing material damage to the extent technologically and economically feasible, to maximize mine stability, and to maintain the value and reasonable foreseeable use of such surface land: *Provided, however, That nothing in this subsection shall be construed to prohibit planned subsidence in a predictable and controlled manner* or the standard method of room and pillar mining. (Emphasis added).

PUSH argues that because the protection of surface structures was an important goal of the General Assembly when it enacted the Subsidence Act,[17] Section 5(e) should be interpreted to provide that where subsidence-causing material damage cannot be prevented because of technological or economical infeasibility, mining should not occur. As a result, it argues EHB's misinterpretation of Section 5(e) as permitting longwall mining unless the homes undermined would be irreparably harmed give mining companies impermissible *carte blanche* to destroy homes to serve its interest.

■ Contrary to this argument, though, is the plain language of Section 5(e) that "nothing ... shall be construed to prohibit planned subsidence;" instead, under the Subsidence Act, mine operators are only required to adopt measures to prevent such damage to the extent that it was technologically or economically feasible. Because, when interpreting statutes, if a statutory provision is not ambiguous, the legislative intent should be effectuated by according the words their plain and

ordinary meaning, 1 Pa.C.S. § 1921(b), PUSH's argument must fail.

### C.

■ PUSH also contends that the EHB erred in determining that the issuance of a mining permit to 84 Mining would not cause pollution to the waters of the Commonwealth because it misinterpreted the definition of "pollution" under the Clean Streams Law, Act of June 22, 1937, P.L.1987, *as amended,* 35 P.S. §§ 691.1—691.1001, by concluding that pollution does not occur absent an adverse impact upon uses of the waters of the Commonwealth. In effect, what PUSH is arguing is that no matter how minimal, coal mines can cause no degradation of the water supply. For their part, Respondents contend that interpretation would mean that there can be no mining or, for that matter, industrial or residential uses because all of those activities place substances in the waters of the Commonwealth. They argue that only substances that cause harm to uses of the waters of the Commonwealth are prohibited by this provision. We agree.

Section 1 of the Clean Streams Law requires that:

> **"Pollution"** shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial *uses,* or to livestock, wild animals, birds, fish or other aquatic life....

35 P.S. § 691.1. (Emphasis added).

In his opinion, ALJ Renwand concluded that the there was no potential pollution to the waters of the Commonwealth, stating:

---

**17.** *See* Section 3 of the Subsidence Act, 52 P.S. § 1406.3.

The Department correctly determined that the mining company's operations would not cause pollution to the shallow groundwater or otherwise cause any pollution which would create a nuisance, be harmful to the public welfare or wildlife, or otherwise adversely affect the uses of groundwater. (N.T. 1101). This determination is consistent with the definition of "pollution" in the state Clean Streams Law, 35 P.S. § 691.1. *See also* 25 Pa. Code § 93.2 (which states that the standards established by Chapter 93 are "based upon water *uses* which are to be protected").

(EHB Adjudication at 105). (Emphasis in original). Because the Clean Streams Law requires that pollution affect the "uses" of the water and the EHB clearly applied that standard, PUSH's argument is without merit.

### D.

Alleging that the Department's approval for 84 Mining's revision application was defective because it did not contain the words "no presumptive evidence of potential pollution to the waters of the Commonwealth" set forth in 25 Pa.Code § 86.37(a)(c),[18] PUSH contends that the permit was invalid. It argues the written findings approving 84 Mining's revision permit application by the Department's Permits Chief, Joseph Leone (Mr. Leone), which stated, in part, that "the presumptive evidence of unpreventable or untreatable pollution to the waters of the Commonwealth has been minimized,"

(The Department's Written Findings dated September 22, 1995), do no meet the standard set forth in the regulation because "minimize" is not the same as "no presumptive evidence of pollution" set forth in 25 Pa.Code § 86.37(a)(3).

■■■ We agree that the Department did not use the "magic words" set forth in the regulations. However, the testimony the EHB found credible was that rather than applying the incorrect standard, the Department's language was imprecise and clarified on appeal to the EHB.

Before the EHB, the following exchange took place between counsel for PUSH and Mr. Leone:

Q. But is it your understanding of the regulations that Section 86.37 requires that the Department make a written finding and that written finding has to state that the applicant has demonstrated that there is no presumptive evidence of potential pollution to the waters of the Commonwealth, is that correct?

A. Yes.

Q. And that is Section 3?

A. Yes.

Q. And the Department did not make that written finding in this case, did it?

A. That is what I was trying to explain earlier. I believe we did contrary to what is in—I understand what the regs are. The reviewers understand what the regs are. Even though that piece of paper says

---

18. The criteria for permit approval or denial enumerated at 25 Pa.Code § 86.37 provides, in part:

(a) A permit or revised permit application will not be approved unless the application affirmatively demonstrates and the Department finds in writing, on the basis of the information in the application or from information otherwise available, which is

documented in the approval, and made available to the applicant, that the following exists:

* * *

3. The applicant has demonstrated that there is no presumptive evidence of potential pollution to the waters of the Commonwealth.

25 Pa.Code § 86.37(a)(3).

"minimize," we require prevention, and we require that through the associated application modules and material that the application submits.

Q. But the finding itself made a finding that pollution would be minimized.

A. The wording of the finding does use the work "minimize," and, as I have explained, my reviewers understand that we prevent.

(N.T. August 18, 1997, at 198–199). Additionally, Laura Kirwan (Ms. Kirwan), the Department's lead hydrologist, who reviewed 84 Mining's application to determine whether the proposed activities presented any potential for pollution of waters of the Commonwealth, also testified in response to counsel's questions regarding the written findings:

Q. Did you indicate to Mr. Leone or Mr. Koricich—and since Mr. Leone provided this letter, to Mr. Leone particularly—that the assessment indicates that the operation has been designed to minimize damage to hydrologic balance within the proposed permit area?

A. I guess I understand this wording in the document as, it does not mirror the regulatory requirements.

Q. Yes.

A. However, to be honest with you, I never read this document. So as far as what's stated in this document, it really doesn't affect my review or my assessment. I understand that I'm supposed to be complying with the regulations.

(N.T. September 10, 1997, at 1280–1281).

Ms. Kirwan also testified that although she is not responsible for drafting the written findings that ultimately accompany a permit approval or denial, following her review of an application to check for compliance with the regulations, she provides a checklist to her supervisor from which the written findings were made. She stated that the section regarding hydrologic consequences was checked okay, and that such a notation could not be made unless the regulatory standard was properly addressed. Although the language used in the written findings authored by Mr. Leone does not mirror the language set forth in 25 Pa.Code § 86.37(a)(3), Ms. Kirwan applied the appropriate standard when reviewing the application; in fact, she credibly testified that she applied the standard set forth in the regulations in performing her hydrologic review. Because the imprecise language was clarified at its hearing, the EHB did not err in concluding that the Department's review found that there was no presumptive evidence of potential pollution to the waters of the Commonwealth.

### E.

Next, PUSH contends that the Department erred in granting 84 Mining's revision permit application because the application did not comply with the provisions of Act 54 that require a mine operator seeking a permit to describe how water supplies will be replaced.

Specifically, Section 5b(j) of the Subsidence Act, 52 P.S. § 1406.5b(j), provides:

[t]he Department shall require an operator to describe how water supplies will be replaced. Nothing contained herein shall be construed as authorizing the Department to require a mine operator to provide a replacement water supply prior to mining as a condition of securing a permit to conduct underground coal mining.

As we stated in *Stoystown Borough Water Authority v. Department of Environmental Protection*, 729 A.2d 170 (Pa.Cmwlth. 1999), the mandate of Section 5b(j) could

not be more clear—the Department shall require an operator to describe how water supplies will be replaced.

■ In Section 8 of its application, 84 Mining described that in the event primary sources were disrupted by mining, alternate sources of supply to local water uses would be provided, such that:

A. Eighty–Four Mining Company (EFMC) will provide within 24 hours temporary potable water or information documenting that EFMC was denied access to the supply to conduct a pre-mining or post-mining survey. If access was not denied, EFMC will provide a water tank and fill it with potable water to meet the needs of the surface owner until the primary water supply can be restored, or developed for up to 3 years. Bottled water may be supplied immediately as preparations are made to deliver and install the water tank.

B. If the water supply does not recover within 3 years, then EFMC will do one of the following:
 - deepen the existing well;
 - drill a new well;
 - provide for tap-in to an existing public water system. Refer to the attached letter from the Pennsylvania American Water Company, which states that, "in general, our public water system is capable of serving the additional homes . . .";
 - other amicable agreement with surface owner as provided for under Sections 5.1, 5.2 and 5.3 of Act 54 of BMSLCA.

The replacement supply as listed above shall be one "which adequately services in quantity and quality the premining uses of the affected supply or any rea-sonable foreseeable uses of the supply." A restored or replacement water supply shall be deemed adequate if it meets drinking water standards under the Pennsylvania State Safe Drinking Water Act, or, if the quality of the affected supply did not meet the Safe Drinking Water Act standards, if the replacement supply is comparable to the premining supply.

84 Mining's Revision Application at 8–15— 8–16. In Section 8 of its application, 84 Mining set forth a step-by-step procedure describing how affected water supplies would be replaced in the event that pre-existing water resources were disrupted by 84 Mining's mining activities. Because that procedure satisfies the mandates of Section 5b(j), PUSH's argument is without merit.

### F.

In its cross-petition, 84 Mining contends that the EHB erred by not deferring to the Department's interpretation of the subsidence bonding requirements of the Subsidence Act. It argues that the Department's bonding policy requiring a uniform $10,000 bond from a mining company to insure faithful performance of its mining operations is proper, and that such policy is entitled to great deference.

Section 5(b) of the Subsidence Act requires that an applicant for an underground mining permit file a bond or other security "to insure the applicant's faithful performance of mining or mining operations." [19] Section 6(b) of the Subsidence Act further requires that an applicant "file a bond in a form prescribed by the secretary payable to the Commonwealth and conditioned upon the applicant's faithful performance of mining or mining operations, in accordance with the provisions of

19. 52 P.S. § 1406.5(b).

sections 5, 5.4, 5.5 and 5.6. Such bond shall be in a reasonable amount as determined by the department."[20]

25 Pa.Code § 86.149 provides guidelines for the determination of a bond amount. That section provides, in part:

(a) The standard applied by the Department in determining the amount of bond will be the estimated cost to the Department if it had to complete the reclamation, restoration and abatement work required under the acts, regulations thereunder and the conditions of the permit. The Department may establish bond rate guidelines which utilized the factors in § 86.145(c) (relating to Department responsibilities).

(b) This amount will be based on, but not limited to, the following:

1. The estimated costs submitted by the permittee in accordance with § 87.68, § 88.96, § 88.492, § 89.71 or § 90.33.

2. Reclamation costs for surface mines related to the specific sized and geometry of the proposed mining operation, the topography and geology of the permit area, the potential for water pollution or hydrologic disturbances, the availability of topsoil and the proposed land use.

3. The costs related to distinct differences in mining methods and reclamation standards for bituminous surface mines, anthracite surface mines and underground mines.

4. The cost of relocating or reconstructing roads or streams within the permit area.

5. The cost of sealing shafts or other mine openings, removal of buildings, facilities or other equipment, constructing, operating and maintaining treatment facilities and correcting surface subsidence.

6. The additional estimated costs to the Department which may arise from applicable public contracting requirements or the need to bring personnel and equipment to the permit area after its abandonment by the permittee to perform reclamation, restoration and abatement work.

7. The amount of fees, fines or other payments made to the Department and dedicated by the Department for reclamation, restoration and abatement of defaulted permit areas.

8. Additional estimated costs necessary, expedient and incident to the satisfactory completion of the requirements of the acts, regulations thereunder and the conditions of the permit.

9. An additional amount based on factors of cost changes during the preceding 5 years for the types of activities associated with the reclamation to be performed.

10. Other cost information as required from the permittee or otherwise available to the Department.

25 Pa.Code § 86.149. Moreover, 25 Pa. Code § 86.150(a) provides that the minimum amount of bond for bituminous coal mining activities shall be $10,000.

Pursuant to its permitting authority, the Department has instituted a uniform bond policy under which it requires a uniform bond of $10,000 for mining activities. As such, the issue before us is whether that bonding policy is reasonable as required under Section 6(b) of the Subsidence Act. We conclude that it is not. 25 Pa.Code § 86.149 provides a standard under which the Department determines the amount of

---

20. 52 P.S. § 1406.6(b).

the bond. It is clear from the factors enumerated in subsection (b) that such determinations were intended to be made on a case-by-case basis, taking into consideration factors specific to each proposed mining area. To enforce across the board, a uniform bond amount such as the Department did here would, in effect, nullify that regulation.

 Although the Subsidence Act granted the Department discretion to determine the amount required for a subsidence bond, the exercise of that discretion is reviewable by the EHB. *See Pequea Township v. Herr,* 716 A.2d 678. Because the Department's uniform bond policy is inconsistent with the requirements of the Subsidence Act and the regulations promulgated thereunder, the EHB did not err in requiring the Department to recalculate the bond amount.

 Accordingly, for the foregoing reasons, the decision of the EHB is affirmed.[21]

### *ORDER*

AND NOW, this *21st* day of *November,* 2001, the order of the Environmental Hearing Board, No. 95–232–R, dated July 2, 1999, is affirmed.

---

21. PUSH also contends that ALJ Renwand erred in failing to recuse himself from the proceedings. It argues that recusal was appropriate because ALJ Renwand's wife, Attorney Sandra Mackey Renwand, had a financial and professional interest in the outcome of the case based on her position as a member of the environmental litigation section at the law firm of Babst, Callands, Clements & Zomnir, P.C., which represented Leatherwood, Inc., a sister company of 84 Mining, in proceedings before the EHB. However, there was no evidence presented that Attorney Renwand was involved with the present action in any way; merely being an attorney who represented a sister company in a separate action is not a sufficient basis to establish that a substantial financial or professional interest in the outcome of the present case existed. Because there is no evidence in the record which would support a finding that ALJ Renwand's impartiality might reasonably be questioned which would have required that he recuse himself under Canon 3(C)(1)(a) of the Code of Judicial Conduct, he did not err in refusing to do so.