**UMCO ENERGY, INC., Petitioner**

v.

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 10, 2007.

Decided Dec. 12, 2007.

John E. Jevicky and Brandon D. Coneby, Pittsburgh, for petitioner.

Michael J. Heilman, Asst. Regional Counsel, Pittsburgh, for respondent.

Kurt J. Weist, Harrisburg, for intervenor, Citizens for Pennsylvania's Future.

BEFORE: LEADBETTER, President Judge, COLINS, McGINLEY, SMITH-RIBNER, PELLEGRINI, SIMPSON and LEAVITT, Judges.

OPINION BY Judge LEAVITT.

UMCO Energy, Inc. (UMCO) petitions for review of an adjudication of the Environmental Hearing Board (EHB) denying UMCO's appeal from an order of the Pennsylvania Department of Environmental Protection (Department). The Department's order restricted UMCO to a technique known as "room-and-pillar" mining in a section of one of its mines in Washington County. In this case we consider whether the Department's authority under the Clean Streams Law [1] to regulate activities that may impact the Commonwealth's waters is superseded by regulations on

---

1. Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §§ 691.1–691.1001. The Department is the Commonwealth agency responsible for administering and enforcing the Mine Subsidence Act, the Clean Streams Law, Section 1917–A of the Administrative Code, and the rules and regulations promulgated thereunder.

mining operations contained in the Bituminous Mine Subsidence and Land Conservation Act (Mine Subsidence Act).[2] We also consider whether the Department's order violated UMCO's equal protection rights. For the reasons that follow, we will affirm the EHB.

The facts in this case are not in dispute. UMCO is a Pennsylvania corporation that operates an underground bituminous coal mine known as the High Quality Mine in Fallowfield Township, Washington County. Initially, the Department permitted UMCO to extract coal using the room-and-pillar method.[3] Beginning in May 2002, the Department issued a series of permit revisions allowing UMCO to use the longwall mining method[4] provided that it did not infringe on the "no subsidence zones" that were designated for several streams above the mine. Two of these streams are at issue in the present action and have

been designated as the "4E/5E Stream" and the "6E Stream." The streams are so-named because of their position relative to the underlying panels in the High Quality Mine; the 4E/5E Stream lies above the 4E and 5E panels and the 6E Stream lies above the 6E panel. The 4E/5E Stream and the 6E Stream have the same hydrogeology. Both are headwater streams that receive natural flow from surface runoff, springs, seeps, and shallow groundwater. The 6E Stream is a perennial stream that flows continuously throughout the calendar year.

UMCO began longwall mining in the 4E and 5E panels in 2004. As a result, the 4E/5E Stream lost flow and eventually became dry.[5] UMCO attempted to restore flow to the 4E/5E Stream by filling cracks and adding public water through a fire hydrant. UMCO twice attempted to discontinue the public water flow to show that

---

**2.** Act of April 27, 1966, P.L. 31, *as amended,* 52 P.S. §§ 1406.1–1406.21.

**3.** The "room and pillar" method consists of a two-step process.

> During the first step, as coal is removed from the mine, blocks of coal known as pillars are left in place in a pre-planned pattern to support the strata overlaying the coal seam being mined. Second, when the primary mining is substantially completed in a particular area, the coal pillars are systematically removed as the mining operation retreats. Operators seek to remove as many coal pillars as possible, consistent with safety.

Robert E. Beck, COLLOQUIM ON SMCRA: A TWENTY YEAR REVIEW: *Protecting The Public Interest or Surface Owners From Their Own Folly?: A Close Look At "Preventing" Subsidence Under the Surface Mining Control and Reclamation Act of 1977 (SMCRA),* 21 S.Ill.U.L.J. 391, 411 (1997) (citing *Keystone Bituminous Coal Association v. Duncan,* 771 F.2d 707, 710 (3d Cir.1985)).

**4.** Longwall mining is conducted through the use of large machines that extract virtually all the coal within a rectangular area known as a

panel without leaving pillars to support the mine roof. As the mining machine moves through the panel, the mine roof collapses behind the machine causing subsidence of the surface overlaying the panel, and often results in loss or damage to natural water resources. This Court has previously described longwall mining as follows:

> The longwall method is generally favored by the industry because it results in an extremely high recovery rate at a relatively low cost. It also requires fewer employees than the room-and-pillar method and is considered to be relatively safer.... Moreover, longwall mining is an accepted method of underground mining which was contemplated by both federal and state mining regulations.... However, the major drawback to the longwall method is that as practiced today, it causes subsidence of the surface ...

*People United to Save Homes v. Department of Environmental Protection,* 789 A.2d 319, 323 (Pa.Cmwlth.2001) (internal citations omitted).

**5.** In addition, all of the springs above the 3E, 4E, and 5E panels stopped flowing after UMCO commenced longwall mining in the 4E and 5E panels.

the natural flow had returned to the 4E/5E Stream; however, the 4E/5E Stream never regained natural flow. As a result, UMCO continues to add public water to the 4E/5E Stream to maintain flow.[6]

UMCO sought an informal permit revision to lift the no-subsidence zone over the 6E panel. The Department requested UMCO to submit hydrological studies to predict the effects of longwall mining on the 6E Stream. UMCO predicted that longwall mining of the 6E panel would have the same effect on the 6E Stream that the mining of the 4E and 5E panels had on the 4E/5E Stream, i.e., a loss of flow. The study concluded, however, that mining would not have any long term adverse impacts on the 6E Stream. The Department rejected UMCO's study and concluded that longwall mining would cause permanent, irreparable damage to the 6E Stream. As a result, on November 12, 2004, the Department issued an order modifying UMCO's permit to preclude longwall mining beneath the 6E Stream. The Department permitted UMCO to use other mining methods in the 6E panel and to use longwall mining in other panels of the mine.

UMCO filed an appeal with the EHB on November 12, 2004,[7] followed by an amended appeal on February 2, 2005. UMCO's amended appeal was limited to the following three issues: (1) whether the Mine Subsidence Act precluded the Department from using its authority under the Clean Streams Law to revise UMCO's permit to mine the 6E panel; (2) whether the Clean Streams Law and its regulations extend to small perennial streams like the 6E Stream; and (3) whether the Department's order prohibiting longwall mining in the 6E panel violated UMCO's equal protection rights under the United States Constitution and Pennsylvania Constitution.[8] The parties proceeded to a hearing before the EHB.

At the hearing, the EHB heard expert testimony from both sides. There was "no dispute among all of the experts that longwall mining the 6E [p]anel would have disrupted flow in the 6E Stream, springs, seeps, and wetlands." EHB Opinion, dated Sept. 5, 2006, at 44, Finding of Fact No. 284. Although UMCO's experts opined that the 6E Stream would eventually recover, they were unwilling to predict when and, moreover, "conced[ed] that it is possible that the 6E Stream will never recover." EHB Opinion, dated Sept. 5, 2006, at 45, Finding of Fact No. 287. Based on the adverse effects of longwall mining on the 4E/5E Stream and the lack of adequate ground between the 6E Stream and the 6E panel, the Department's experts testified

6. UMCO pumped a total of 28,340,000 gallons of public water into the 4E/5E Stream between May 20, 2004, and September 16, 2005.

7. UMCO also filed a supersedeas petition, which was denied. UMCO subsequently filed a petition for review of the supersedeas denial to this Court, which this Court rejected.

8. Prior to the date set for the close of discovery, UMCO petitioned the Pennsylvania Supreme Court to assume King's Bench jurisdiction over the matter. The Supreme Court rejected UMCO's petition. UMCO later publicly announced that it would be closing the

mine at issue. As a result, the Department filed a motion to dismiss the appeal as moot. The EHB denied the Department's motion and a hearing was scheduled. After the close of discovery and one week before the hearing date, UMCO designated for the first time several experts it intended to call at the hearing. In response, the Department filed a motion in limine, which was denied by the EHB. Instead, the EHB issued an order postponing the hearing to allow the Department to conduct discovery with respect to the newly identified experts. UMCO again filed a petition for review with this Court to review the EHB's order postponing the hearing, but it later withdrew that petition.

that the 6E Stream would be irreparably harmed by the proposed longwall mining of the 6E panel. The experts for intervenor, Citizens for Pennsylvania's Future (PennFuture), agreed with this opinion. The EHB found that, unlike UMCO's experts, the experts for the Department and PennFuture had extensive training and experience relative to the impact of subsidence on surface waters. Therefore, the EHB credited the testimony of the Department's and PennFuture's experts and rejected as not credible the opinions of UMCO's experts.

The EHB issued its opinion on September 5, 2006. The EHB found that the 6E Stream was a perennial stream that would be permanently dewatered by UMCO's longwall mining of the 6E panel. The EHB concluded that the Department had authority under the Clean Streams Law to prohibit UMCO from conducting longwall mining on the 6E panel because of the danger of pollution to the waters of the Commonwealth in the 6E Stream. The EHB left the record open for UMCO to introduce evidence in support of its claim that it had been denied equal protection. On March 19, 2007, the EHB issued an amended adjudication rejecting UMCO's equal protection claim. The EHB found that UMCO failed to prove that surface developers and underground coal mine operators were similarly situated. The EHB further found that, even assuming a mine

operator was similar to a surface developer, UMCO failed to prove it was treated disparately. The present appeal followed.

Before this Court, UMCO raises the following issues: (1) whether the EHB erred in concluding that the Mine Subsidence Act does not prohibit the Department from regulating mining activities under the Clean Streams Law if those activities will impact Commonwealth waters; (2) whether the EHB erred in concluding that the Clean Streams Law and its regulations protect all waters of the Commonwealth, including small perennial streams; and (3) whether the EHB erred in concluding that the Department's order limiting longwall mining did not violate UMCO's equal protection rights. We will address UMCO's contentions *seriatim.*[9]

## The Department's Revision of Mine Permits Under Authority of Clean Streams Law

■ In its first issue, UMCO contends that the Department must issue a mining permit where the operator's proposed plan to prevent mine subsidence adopts every technically and economically feasible measure to prevent subsidence, in satisfaction of Section 5(e) of the Mine Subsidence Act. UMCO argues that the permit must be issued even where the proposed plan will not prevent the destruction of a perennial stream, in violation of the Clean Streams Law.[10] Stated otherwise, UMCO argues

---

9. This Court's standard of review of a decision from the EHB is whether findings of fact were supported by substantial evidence and whether constitutional violations or errors of law were committed. *City of Erie (Council) v. Department of Environmental Protection,* 844 A.2d 586, 589 n. 4 (Pa.Cmwlth.2004).

10. Under the Clean Streams Law, the Department has legal authority to issue orders to prevent the pollution of waters of the Commonwealth, which are defined very broadly to include "any and all rivers, streams ... or

parts thereof." 35 P.S. § 691.1. Section 610 of the Clean Streams Law provides:

> The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. Such orders shall include, but shall not be limited to, orders modifying, suspending, or revoking permits.... Such an order may be issued if the department finds that a condition existing in or on the operation involved is causing or is creating a danger of pollution of the waters of the Commonwealth....

that Section 5(e) of the Mine Subsidence Act supersedes any other statute that might apply to mine subsidence, including the Clean Streams Law.

We begin with a review of Section 5(e) of the Mine Subsidence Act, on which UMCO bases its argument that the Clean Streams Law has no relevance to the issuance of a mine subsidence permit. Section 5(e) states:

An operator of a coal mine subject to the provisions of this act shall adopt measures and shall describe to the department in his permit application measures that he will adopt to prevent subsidence causing material damage *to the extent technologically and economically feasible,* to maximize mine stability, and to maintain the value and reasonable foreseeable use of such surface land: *Provided, however, That nothing in this subsection shall be construed to prohibit planned subsidence in a predictable and controlled manner* or the standard method of room and pillar mining.

52 P.S. § 1406.5(e) (emphasis added). UMCO reads this provision to mean that a mining operator is required to "prevent subsidence" but only "to the extent technologically and economically feasible." *Id.* A mining operation that adopts such a plan, UMCO argues, is exempt from the standards in the Clean Streams Law.

As in any statutory construction issue,[11] the goal is to "ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, a statute's plain language provides the best indication of legislative intent. *See Commonwealth v. McClintic,* 589 Pa. 465, 472, 909 A.2d 1241, 1245 (2006). A statute shall be construed to give effect to all its provisions so that no provision is mere surplusage. 1 Pa.C.S. § 1921(a). Additionally, although we must "listen attentively to what a statute says[;] one must also listen attentively to what it does not say." *Kmonk–Sullivan v. State Farm Mutual Automobile Insurance Co.,* 567 Pa. 514, 525, 788 A.2d 955, 962 (2001).

Applying these principles here, we conclude that UMCO's construction of Section 5(e) must be rejected. It does not comply with the plain language of the Mine Subsidence Act and does not give full effect to the entire statute. UMCO's theory that its subsidence plan is exempt from the Clean Streams Law lacks merit.

First, Section 5(e) does not state that other statutes or regulations have no application to a mine operator's activities. Section 5(e) states simply that nothing in "this subsection"—*i.e.,* Subsection (e) of Section 5 of the Mine Subsidence Act—shall be construed to prohibit planned and controlled subsidence. For example, Section 5(e) requires mine operators to use what is "technologically and economically feasible" to prevent subsidence. As clarified in the "provided, however" clause of Section 5(e),

35 P.S. § 691.610. *See also* 35 P.S. § 691.611 (unlawful to commit water pollution); 35 P.S. § 691.5 (the Department has authority to issue orders); 25 Pa.Code § 86.37 (there must be no presumptive evidence of pollution to waters of the Commonwealth); 25 Pa.Code § 89.36 (the mine operator must ensure protection of the hydrologic balance and prevent adverse hydrologic consequences); 25 Pa. Code § 89.65(a) (the mine operator must protect environmental values); 25 Pa.Code § 89.142a (mine operator must protect values and uses of streams). In this case, UMCO does not challenge the Department's authority under the Clean Streams Law, but rather, whether said authority is preempted by Section 5 of the Mine Subsidence Act.

11. Where the question is one of statutory construction, this Court's review is plenary as it poses a pure issue of law. *Snizaski v. Workers' Compensation Appeal Board (Rox Coal Co.),* 586 Pa. 146, 154, 891 A.2d 1267, 1272 (2006).

the existence of this requirement should not be construed to mean that a mine operator's plan must prevent any and all subsidence.

Second, UMCO's exemption theory is directly contradicted by Section 9.1 of the Mine Subsidence Act, 52 P.S. § 1406.9a, which specifically preserves the statutory protections for the waters of the Commonwealth. Section 9.1(d) states as follows:

*Nothing in this act shall be construed to amend, modify or otherwise supersede* standards related to prevailing hydrologic balance contained in the Surface Mining Control and Reclamation Act of 1977 (Public Law 95–87, 30 U.S.C. § 1201 et seq.) and regulations promulgated by the Environmental Quality Board for the purpose of obtaining or maintaining primary jurisdiction over the enforcement and administration of that act nor *any standard contained in the act of June 22, 1937 (P.L. 1987, No. 394), known as "The Clean Streams Law," or any regulation promulgated thereunder* by the Environmental Quality Board.

52 P.S. § 1406.9a(d) (emphasis added). Section 9.1(d) applies to the entire Mine Subsidence Act. Therefore, it expressly provides that nothing in the Mine Subsidence Act, including Section 5(e), shall be construed to amend, modify or otherwise supersede the Clean Streams Law or its regulations.

Third, UMCO's theory is inconsistent with this Court's decision in *People United to Save Homes (PUSH) v. Department of Environmental Protection*, 789 A.2d 319 (Pa.Cmwlth.2001). In *PUSH*, the petitioner, a citizens group, challenged the Department's approval of a permit revision to allow longwall mining. The petitioner contended that the mining operator's application did not comply with Section 5(e) of the Mine Subsidence Act even though the op-

erator had adopted measures to prevent subsidence "to the extent technologically and economically feasible." The petitioner argued that Section 5(e) should be interpreted to mean that mining should not be allowed unless the operator was able to prevent any damage to homes caused by subsidence. The EHB held, however, that Section 5(e) permitted "longwall mining *unless the homes undermined would be irreparably harmed." Id.* at 328 (emphasis added).

This Court affirmed the EHB, explaining that, under Sections 5(e) and 9.1(d),

[c]oal mining companies were required to adopt measures that would prevent material damage to surface structures to the extent technologically and economically feasible, and if mining were to result in irreparable damage, the Department could prohibit such mining.

*Id.* at 325. Notably, this Court also affirmed the EHB's holding that the permitted mining operations would not cause pollution to the waters of the Commonwealth, as the term is defined in the Clean Streams Law. *Id.* at 329.

In sum, we reject UMCO's broad reading of Section 5(e) of the Mine Subsidence Act, which establishes that mining operators do not have to prevent *any* subsidence so long as they pursue technologically feasible measures to prevent subsidence. On the other hand, Section 5(e) does not establish that all subsidence, even that which would result in a violation of the Clean Streams Law, may occur so long as the mine operator adopts technologically feasible measures to prevent that subsidence. Most importantly, Section 9.1(d) makes it clear that Section 5(e) cannot be read to supersede the Clean Streams Law.

The EHB found that the 6E Stream was a perennial stream that would be permanently dewatered by UMCO's longwall

mining of the 6E panel, in violation of the Clean Streams Law. We agree and hold that the Department had authority under the Clean Streams Law to prohibit UMCO's longwall mining of the 6E panel, even though UMCO adopted measures to maintain the 6E Stream to the extent technologically and economically feasible.

### The Clean Streams Law and Small Perennial Streams

UMCO next argues that the EHB erred in its application of the regulation at 25 Pa.Code § 89.142a(h), which sets forth subsidence control performance standards. The EHB interpreted this regulation to mean that the Department has legal authority to protect the values and uses of perennial streams regardless of size. UMCO argues that the regulation applies only to "large," continuously flowing perennial streams, not to a stream so small that it has no name, such as the "6E Stream." [12] In support, UMCO directs the Court to the preamble to the regulation, which states that the regulation applies to "larger streams." [13]

■ UMCO asserts that the preamble must be considered in construing the regulation because there exists an ambiguity as to what types of perennial streams qualify for protection—*i.e.*, only large perennial streams or all perennial streams regardless of size. It is true that preambles may be used to resolve an ambiguity in a statute.[14] However, preambles may not be used to create ambiguity where none exists, and in any case where a preamble is used as a tool to resolve an ambiguous law, the preamble is not controlling. *English v. Commonwealth*, 816 A.2d 382, 387 (Pa. Cmwlth.2003). Before we look to the preamble for aid in construing the regulation, we must first find that the regulation creates an ambiguity.

■ We turn then to the language of the regulation in question. Section

---

12. UMCO additionally asserts that the 6E Stream does not flow continuously throughout the year. However, the EHB found, as fact, that the 6E Stream "flows continuously throughout the year, year in and year out." EHB Opinion, dated Sept. 5, 2006, at 54; *see also* EHB Opinion, dated Sept. 5, 2006, at 27, Finding of Fact No. 158. UMCO has not challenged the EHB's findings of fact as unsupported by substantial evidence of record. Accordingly, the parties and this Court are bound by the unchallenged facts as found by the EHB.

13. The discussion and comments to the preamble state:

> The [Pa. Environmental Quality Board] believes that the current regulation in combination with the Department's technical guidance on perennial stream protection ... provides sufficient protection for perennial streams located above and adjacent to underground mines. Since implementing the guidance in January 1994, the Department has not encountered any situations when perennial streams have been adversely affected by diminution due to under-

ground mining. *The Board notes that the subsection applies only to larger streams which flow continuously throughout the calendar year, and that there are interests who believe that its application should be expanded to include smaller streams.*

28 Pa.Bull. 2761 (June 13, 1998) (emphasis added). Based on the foregoing, UMCO argues that the 6E Stream is not entitled to regulatory protection because it is a "smaller" stream.

14. Section 1924 of the Statutory Construction Act of 1972 provides as follows:

> The title and preamble of a statute may be considered in the construction thereof. Provisos shall be construed to limit rather than to extend the operation of the clauses to which they refer. Exceptions expressed in a statute shall be construed to exclude all others. The headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof.

1 Pa.C.S. § 1924.

89.142a(h) addresses the protection of perennial streams by subsidence control and states as follows:

(h) Perennial streams.

(1) *Underground mining operations shall be planned and conducted in a manner which maintains the value and reasonably foreseeable uses of perennial streams,* such as aquatic life; water supply; and recreation, as they existed prior to coal extraction beneath streams.

(2) If the Department finds that the underground mining operations have adversely affected a *perennial stream,* the operator shall mitigate the adverse effects to the extent technologically and economically feasible, and, if necessary, file revised plans or other data to demonstrate that future underground mining operations will meet the requirements of paragraph (1).

25 Pa.Code § 89.142a(h). The regulation states, quite simply, that underground mine operators must conduct their activities in a manner that will maintain the values and reasonably foreseeable uses of "perennial streams." The regulation does not distinguish between large and small

perennial streams; it applies to all perennial streams regardless of size.

Nevertheless, UMCO sees an ambiguity because the regulation contains two definitions of perennial streams. One definition relates to subsidence control, and the other relates to erosion and sediment control.[15] Neither definition, however, distinguishes between large and small streams. Most significantly, there is no ambiguity because there is only one definition applicable to subsidence control, *i.e.,* the subchapter including 25 Pa.Code § 89.142a. This definition states, in relevant part, as follows:

*For the purposes of this subchapter,* perennial stream is a stream or part of a stream that flows continuously throughout the calendar year as a result of groundwater discharge or surface runoff. The term does not include intermittent or ephemeral streams.

25 Pa.Code § 89.141(b)(2) (emphasis added). Because there is no ambiguity in the regulation about whether a perennial stream must be large or small before the mine subsidence control regulation is triggered, there is no reason to consult the preamble to the regulation.

UMCO concedes that the 6E Stream is a perennial stream, and it does not challenge this factual finding of the EHB.[16] Wheth-

---

15. The definition of perennial streams found in the erosion and sediment control regulations states:

Perennial stream—A body of water flowing in a channel or bed composed primarily of substrates associated with flowing waters and is capable, in the absence of pollution or other manmade stream disturbances, of supporting a benthic macroinvertebrate community which is composed of two or more recognizable taxonomic groups of organisms which are large enough to be seen by the unaided eye and can be retained by a United States Standard No. 30 sieve (28 meshs per inch, 0.595 millimeter openings) and live at least part of their life cycles within or upon available substrates in a body of water or water transport system.

25 Pa.Code § 89.5.

16. The Board explained as follows:

The 6E Stream is perennial. It is perennial under every conceivable regulatory definition. Thus, this appeal does not implicate the Department's authority to regulate the adverse effects of subsidence on intermittent or ephemeral streams. The 6E Stream flows continuously throughout the year, year in and year out. Biological evidence supports that finding, but there is plenty of other evidence, including eyewitness testimony, to support the characterization of the stream as perennial even without the biological evidence.

EHB Opinion, dated Sept. 5, 2006, at 53–54.

er the 6E Stream is a large or small perennial stream is irrelevant. UMCO's contrary position finds no support in the Clean Streams Law, which does not categorize between large and small streams; rather, it defines the waters of the Commonwealth to include "any and all ... streams." 35 P.S. § 691.1. The definition of pollution pertains to "any waters" and without limitation to type of harm. *Id.*

In sum, there is no ambiguity in the mine subsidence control regulation. The EHB correctly interpreted the plain language of 25 Pa.Code § 89.142a(h) to mean that the Department has authority to regulate a mining activity in order to protect the "values and reasonably foreseeable uses of perennial streams" regardless of their size. Accordingly, we will affirm the EHB in this regard.

### UMCO's Equal Protection Rights Under the Constitutions of United States and Pennsylvania

Finally, UMCO argues that the prohibition of its proposed longwall mining of the 6E panel violated its right to equal protection under the law as guaranteed by the United States and Pennsylvania Constitutions.[17] UMCO asserts that in its enforcement of the Clean Streams Law, the Department "intentionally and systematically creates arbitrary classifications." UMCO Brief at 40. Specifically, UMCO contends that the Department treated it differently from surface developers under the Clean Streams Law by disallowing mining that would result in the permanent dewatering of a stream, while at the same time allowing surface land developers to fill or culvert streams.

UMCO's burden is a heavy one. It must show that the Department's disparate treatment "clearly, palpably and plainly" violates its constitutional right to equal protection under the law. *Commonwealth v. Sutley,* 474 Pa. 256, 260–61, 378 A.2d 780, 782 (1977). The essentials of equal protection under the United States and Pennsylvania Constitutions have been explained by our Supreme Court as follows:

> *The essence of the constitutional principle of equal protection under the law is that like persons in like circumstances will be treated similarly.* However, it does not require that all persons under all circumstances enjoy identical protection under the law. *The right to equal protection under the law does not absolutely prohibit the Commonwealth from classifying individuals for the purpose of receiving different treatment, and does not require equal treatment of people having different needs.* The prohibition against treating people differently under the law does not preclude the Commonwealth from resorting to legislative classifications, provided that those classifications are reasonable rather than arbitrary and bear a reasonable relationship to the object of the legislation. In other words, a classification must rest upon some ground of difference which justifies the classification and have a fair and substantial relationship to the object of the legislation.

*Curtis v. Kline,* 542 Pa. 249, 254–255, 666 A.2d 265, 267–268 (1995) (emphasis added).[18] Here, there is no claim that the

---

17. Our Supreme Court treats equal protection claims under the Fourteenth Amendment to the United States Constitution the same as equal protection claims brought under Article I, Section 26 and Article III, Section 32 of the Pennsylvania Constitution. *Commonwealth v.*

*Albert,* 563 Pa. 133, 138, 758 A.2d 1149, 1151 (2000) (quotation omitted).

18. Legislative classifications are: (1) classifications which implicate a "suspect" class or a fundamental right; (2) classifications impli-

Clean Streams Law has established classifications. Indeed, the statute protects streams without regard to the identity of the person or activity that violates its terms. Stated otherwise, the Clean Streams Law does not treat surface developers differently from underground mine operators.

■ This case is one of alleged discriminatory enforcement. In order to establish discriminatory enforcement, the party claiming such discrimination must prove that the system of enforcement had a "discriminatory effect" and was "motivated by a discriminatory purpose." *Correll v. Department of Transportation, Bureau of Driver Licensing*, 726 A.2d 427, 431 (Pa. Cmwlth.1999) (citing *Wayte v. United States*, 470 U.S. 598, 609, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). This is particularly difficult to prove. Indeed, this Court long ago observed that the "concept of equal protection does not require that [the administrative agency] attack a problem all at once or not at all." *Life Insurance Company of North America v. Insurance Department*, 43 Pa.Cmwlth. 282, 402 A.2d 297, 299 (1979). Stated otherwise, the Department does not have to respond to every violation of statute in an identical fashion to avoid an equal protection challenge.

■ Here, UMCO asserts that it was discriminatory for the Department to allow surface developers to divert and culvert streams. First, these permits were not issued under the Clean Streams Law, but under the Dam Safety and Encroachments Act.[19] UMCO's equal protection argument, however, is based upon the Clean Streams Law. Second, UMCO has not requested to culvert or divert the 6E Stream under the Dam Safety and Encroachments Act, or under any statute. Third, although the Department has issued permits for converting or relocating streams, and/or filling wetlands, the evidence was uncontroverted that it has never issued such a permit for a project that would destroy a perennial stream. Here, the EHB found that UMCO's longwall mining of the 6E panel would result in the permanent elimination of the 6E Stream.

In short, UMCO failed to establish that the Department has enforced the Clean Streams Law in a way to discriminate against UMCO. The Department permitted UMCO to longwall mine under the 4E/5E Stream on three occasions. It was only after UMCO caused the 4E/5E Stream to become dewatered that the Department took action to prevent a similar loss of flow in the 6E stream, while at the same time allowing UMCO to continue to longwall mine other mine panels and to room-and-pillar mine the 6E panel. UMCO has presented no evidence to support its position that the Department's

---

cating an "important" though not fundamental right or a "sensitive" classification; and (3) classifications which involve none of these. *Probst v. Department of Transportation, Bureau of Driver Licensing*, 578 Pa. 42, 56, 849 A.2d 1135, 1143–1144 (2004). The degree of scrutiny is determined by the type of interest affected by the statutory classification, and classifications relating to the right to engage in a lawful occupation are to be analyzed under the rational basis test. *Plowman v. Department of Transportation, Bureau of Driver Licensing*, 535 Pa. 314, 319, 635 A.2d 124, 126 (1993). As explained by our Supreme Court, the rational basis test requires a two-step analysis:

> First, we determine whether the challenged statute seeks to promote any legitimate state interest or public value; and if so, we then determine whether the legislative classification is reasonably related to accomplishing that articulated state interest.

*Kramer v. Workers' Compensation Appeal Board (Rite Aid Corp.)*, 584 Pa. 309, 335, 883 A.2d 518, 534 (2005).

**19.** Act of November 26, 1978, P.L. 1375, *as amended,* 32 P.S. §§ 693.1–693.27.

permitting decisions have been driven by malicious intent. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (a party complaining of an equal protection violation must prove that it has been *intentionally* treated differently from others similarly situated).[20]

UMCO has failed to prove factually that the Department enforced any statute, including either the Clean Streams Law or the Mine Subsidence Act, in a manner that discriminates against UMCO. Accordingly, we hold that UMCO's right to equal protection under the law was not offended by the Department's revision to UMCO's mining permit.

### Conclusion

In sum, we reject UMCO's claim that its mine subsidence permit could not be revised by the Department under authority of the Clean Streams Law. We reject UMCO's claim that the 6E Stream was too small of a perennial stream to be governed by the Department's regulation at 25 Pa. Code § 89.142a(h). Finally, we reject UMCO's claim that it has been denied equal protection under the law.

For all these reasons, we affirm the EHB.

### ORDER

AND NOW, this 12th day of December, 2007, the order of the Environmental Hearing Board dated March 19, 2007, in the above captioned matter is hereby AFFIRMED.

---

**20.** Because UMCO has not requested a permit to culvert a stream, it is not similarly situated to persons that requested and received a permit.