# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

National Fuel Gas Midstream : 
Corporation and NFG Midstream : 
Trout Run, LLC, : 
                          Petitioners : 
                          : 
          v. : No. 116 C.D. 2016
                          : 
Pennsylvania Department of : 
Environmental Protection, : 
                          Respondent : 
                          : 
Seneca Resources Corporation, : 
                          Petitioner : 
                          : 
          v. : No. 195 C.D. 2016
                          : Argued: November 15, 2016
Pennsylvania Department of : 
Environmental Protection, : 
                          Respondent : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ROBERT SIMPSON, Judge
           HONORABLE P. KEVIN BROBSON, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                    **FILED:  June 2, 2017**

National Fuel Gas Midstream Corporation (NFG Midstream), NFG

Midstream Trout Run, LLC (Trout Run) (together, Midstream), and Seneca

Resources Corporation (Seneca) (collectively, Petitioners) petition for review of

the December 29, 2015 Order of the Environmental Hearing Board (EHB), affirming the Department of Environmental Protection's (DEP) Single Source Determination that aggregated Trout Run's Bodine Compressor Station and Seneca's Well Pad E for purposes of permitting. This case concerns DEP's air quality permitting requirements in the context of an integrated corporate ownership model used by some companies engaged in natural gas extraction and production. Specifically at issue is under what circumstances two facilities owned by two separate business entities that ultimately derive from a common company may be aggregated for air pollution control permitting purposes when one of the two entities is otherwise exempt from permitting requirements. Seneca, which owns and operates Well Pad E, a natural gas well pad, is an oil and gas exploration and production company that is a wholly-owned subsidiary of National Fuel Gas Company (NFGC). (EHB Adjudication, Findings of Fact (FOF) ¶¶ 42-43; R.R. at 68a.) Seneca was incorporated in 1913 and operates in the Appalachian area, as well as California and Kansas. (FOF ¶ 41; NFGC Form 10-K, R.R. at 802a.) It is undisputed that Seneca is exempt from the permitting requirements at issue here. (R.R. at 42a, 290a-94a; EHB Adjudication at 43 (Labuskes, J., concurring).) Trout Run, which owns and operates the Bodine Compressor Station, a compressor and processing facility, is a wholly-owned subsidiary of NFG Midstream, which is a wholly-owned subsidiary of NFGC. (FOF ¶¶ 1, 46, 49.) Both NFG Midstream and Trout Run were established more recently, 2008 and 2010, respectively, and their operations are limited to the Appalachian area. (FOF ¶¶ 44-45; R.R. at 802a.) NFG Midstream and its subsidiaries, including Trout Run, manage the midstream portion of NFGC's natural gas operations by gathering natural gas from upstream

producers like Seneca and processing it for delivery into interstate gas pipelines. (FOF ¶¶ 48, 50.)

Petitioners challenge the aggregation of the emissions of their two facilities as a "single source" for permitting purposes under applicable federal and state environmental statutes and regulations. To fully understand the specific issues raised by Petitioners, it is necessary to first review those statutes and regulations.

## I.     Air Pollution Control in the Natural Gas Sector

Air pollution from natural gas operations is regulated in Pennsylvania through the federal Clean Air Act[1] and the Pennsylvania Air Pollution Control Act (APCA).[2] The Clean Air Act and the APCA require new stationary sources of air pollution and major modifications at existing sources to obtain an air pollution permit prior to commencing construction. Section 6.1(a) of the APCA, 35 P.S. § 4006.1(a); Section 165(a) of the Clean Air Act, 42 U.S.C. § 7475(a). The permit review process, called New Source Review, allows DEP to set a specific emission rate for each regulated facility. 25 Pa. Code § 127.1. The requirements of a new source permit differ depending on whether the air quality at the location under review meets federal National Ambient Air Quality Standards (NAAQS). Congress developed two air pollution control programs based on air quality. "For areas with unclean air – called 'nonattainment' areas because they are not attaining the NAAQS – the Nonattainment New Source Review [(NNSR)] program ensures that new emissions will not significantly hinder the area's progress towards meeting the NAAQS." United States v. EME Homer City Generation, L.P., 727

---

[1] 42 U.S.C. §§ 7401 – 7671q.
[2] Act of January 8, 1960, P.L. 2119, as amended, 35 P.S. §§ 4001-4015.

F.3d 274, 279 (3d Cir. 2013). The Prevention of Significant Deterioration (PSD) program addresses areas with clean air and "ensures that any new emissions will not significantly degrade existing air quality." Id. Pennsylvania has adopted the federal regulations on the PSD program standards in their entirety. 25 Pa. Code § 127.83. For those areas falling under the NNSR program, DEP has promulgated its own regulations. 25 Pa. Code §§ 127.201-127.218. The area at issue in this appeal meets federal air quality standards and is governed by the federal PSD regulations in effect at the time of the EHB Order, which are found at 40 C.F.R. § 52.21 (2015).

Pursuant to Section 6.1(f) of the APCA, 35 P.S. § 4006.1(f),[3] DEP promulgated by regulation a general permit for natural gas processing facilities, such as the Bodine Compressor Station, known as General Permit 5 (GP-5).[4] The GP-5 Permit may only be used for facilities that emit below a certain threshold, referred to as "major source thresholds." "Major sources"[5] of air pollution cannot

---

[3] Added by Section 6 of the Act of October 26, 1972, P.L. 989, as amended.

[4] Although Trout Run is subject to these permitting requirements, Seneca's well pad operations are subject to an exemption from permitting requirements under the APCA. (R.R. at 42a.)

[5] A "major source" for Title V purposes is defined as a

> stationary source (or any group of stationary sources that are located on one or more contiguous or adjacent properties, and are under common control of the same person (or persons under common control)) belonging to a single major industrial grouping . . . that directly emits, or has the potential to emit, 100 t[ons ]p[er ]y[ear] or more of any air pollutant subject to regulation . . . .

40 C.F.R. § 70.2 (2015); see also 40 C.F.R. § 52.21(b)(1)(i) (2015) (defining major stationary source for PSD purposes and the associated thresholds of different types of facilities).

obtain a GP-5 permit but must obtain a Title V[6] permit to operate. (DEP's GP-5 Permit at 2, R.R. at 214a); 25 Pa. Code §§ 127.501-127.543.

When developing the specific requirements of a GP-5 permit, DEP must first define the source of the air pollutants regulated by the permit. Section 111(a)(3) of the Clean Air Act defines a **stationary source** as "**any building, structure, facility, or installation which emits or may emit an air pollutant**." 42 U.S.C. § 7411(a)(3)[7] (emphasis added). The federal regulations adopted by Pennsylvania in effect at the time of the EHB's Order defines "[b]uilding, structure, facility, or installation" as "all of the pollutant-emitting activities which belong to the same industrial grouping, are located on **one or more contiguous or adjacent properties**, and are **under the control of the same person (or persons under common control)** except the activities of any vessel." 40 C.F.R. § 52.21(b)(6) (2015) (emphasis added).

In addition, the federal Environmental Protection Agency (EPA), in 1980, viewed the decision in <u>Alabama Power Co. v. Costle</u>, 636 F.2d 323 (D.C. Cir. 1979), as setting certain boundaries on the "component terms of 'source,'" *i.e.* "building, structure, facility, and installation," namely: "(1) it must carry out reasonably the purposes of PSD; (2) it must approximate **a common sense notion of 'plant'**[8]; and (3) it must avoid aggregating pollutant-emitting activities that as a

---

[6] 42 U.S.C. §§ 7671-7671q. Title V is named after the portion of the Clean Air Act added in the Clean Air Act Amendments of 1990. The Title V program "generally does not impose new substantive air quality control requirements." <u>Sierra Club v. Johnson</u>, 436 F.3d 1269, 1272 (11th Cir. 2006). Instead, the intent of Title V is to "ensure compliance with existing requirements" by requiring permits that "contain monitoring, record keeping, reporting, and other conditions." <u>Id.</u>

[7] Added by Section 4(a) of the Act of December 31, 1970, <u>as amended</u>.

[8] The term "common sense notion of plant" was referenced in the regulatory preamble but does not appear in the regulations themselves. As discussed, *infra*, whether "common sense **(Footnote continued on next page…)**

5

group would not fit within the ordinary meaning of 'building,' 'structure,' 'facility,' or 'installation.'" 45 Fed. Reg. 52,676, 52,694-95 (Aug. 7, 1980) (emphasis added).

Because the regulations define "building, structure, facility, or installation" as including **one or more** properties, two or more related natural gas operations may be aggregated by DEP into a single source for purposes of permitting. Alabama Power, 636 F.2d at 410. This aggregation process determines whether the two operations work together to form a major source of pollution and are subject to the reporting requirements of Title V. Natural gas companies have an incentive to design their activities in a manner that prevents emissions from reaching major source thresholds, and permitting authorities utilize the single source aggregation process to ensure that actual emissions are properly accounted for. 45 Fed. Reg. 52,676, 52,694-95.

To aid with determining when two facilities should be treated as a single source, DEP has provided guidance to its permitting officers.[9] (See Guidance for Performing Single Stationary Source Determinations for Oil and Gas Industries (DEP Guidance), R.R. at 205a-12a.) The DEP Guidance states that the determination should be conducted on a case-by-case basis and judged against a **three-part test** based on the EPA's definition of a "building, structure, facility, or installation." (Id. at 1, 3, R.R. at 205a, 207a.) Specifically, DEP Guidance

---

**(continued…)**
notion of plant" is an independent requirement or an overarching principle in the aggregation analysis is at issue in this case.

[9] Despite the existence of the DEP Guidance document, DEP's Chief of the Division of Permits testified via deposition and repeatedly refers to the single-source analysis as a "judgment call" on no less than a dozen occasions. (See, e.g., R.R. at 303a, 307a-11a, 314a-16a, 318a, 325a-26a.)

6

provides that if two or more facilities: (1) "belong to the same industrial grouping" (defined as having the same first two digits of the Standard Industrial Classification (SIC) code); (2) are on "one or more **contiguous or adjacent properties**"; and (3) "are **under the control of the same person (or persons under common control**)," they should be treated as a single facility for permitting purposes. (Id. at 4, R.R. at 208a (emphasis added).)

Whereas the EPA has historically considered adjacency as including the functional interdependence of the facilities being aggregated, not simply the physical distance between them, when discussing the common sense notion of a plant concept in its Guidance document, DEP finds the terms "contiguous" or "adjacent" are clear on their face and adopts a "**quarter-mile or less rule**," meaning "properties located a quarter mile or less apart are considered contiguous or adjacent," whereas "properties located beyond this quarter-mile range may only be considered contiguous or adjacent on a case-by-case basis." (DEP Guidance at 6, R.R. at 210a.) DEP reasoned that "application of the quarter-mile or less rule of thumb takes a 'common sense approach' to determining if the sources are located on adjacent or contiguous properties and does not aggregate pollutant-emitting activities that as a group would not fit within the ordinary meaning of 'building,' 'structure,' 'facility,' or 'installation.'" (Id. at 7, R.R. at 211a.) As an aside, we note that, because of the nature of the natural gas industry, the **EPA promulgated a revised rule** for determining emission sources in the oil and gas sector. 81 Fed. Reg. 35,622 (June 3, 2016). Thus, **if this case had been brought under the revised regulation, which became effective on August 2, 2016, the analysis would require a finding** that the facilities be located within one-quarter mile of one another, as measured from the center of the equipment on the surface site, **and**

**that they share equipment**. 40 C.F.R. § 52.21(b)(6)(ii) (2016) (emphasis added). These facilities do not share equipment.

## II.    DEP's Single Source Analysis of the Bodine Compressor Station

Trout Run applied for a GP-5 permit to construct and operate the Bodine Compressor Station on August 14, 2013.  (FOF ¶ 1.)  As part of its review of **Trout Run's** permit application, DEP demanded emissions data for **Seneca's** Well Pad E, which was **otherwise exempt** from permitting requirements.  (R.R. at 42a, 286a, 292a-94a; EHB Adjudication at 43 (Labuskes, J., concurring).)  After initially refusing to provide such data, Seneca finally yielded to DEP's demands and provided the data under protest.  (R.R. at 290a-91a, 295a-96a.)  Subsequently, DEP issued the GP-5 permit to Trout Run, authorizing the construction and operation of the Bodine Compressor Station on October 10, 2013.  (FOF ¶ 5.)  However, DEP concluded that **Seneca's Well Pad E should be aggregated with Trout Run's Bodine Compressor Station under the same GP-5 permit as a single source**, **despite Well Pad E being exempt** from permitting requirements. (FOF ¶ 13; R.R. at 42a.)  Specifically, DEP stated that any difference in SIC codes was overridden by its finding of a support relationship between the two facilities;[10] common control existed because of the existence of common ownership, a contractual agreement between the parties, and a support/dependency relationship; and based upon the distance between the two facilities, they met the contiguous or adjacent criterion.  (R.R. at 197a-98a.)

---

[10] Trout Run originally maintained that the proper SIC code for the Bodine Compressor Station was 4922, and the SIC code for Seneca's Well Pad E was 1311.  (R.R. at 197a.)

8

Trout Run and NFG Midstream appealed DEP's decision to aggregate the two facilities to the EHB on November 12, 2013. Seneca intervened in the matter. As part of settlement discussions, "[NFG] Midstream provided additional information to [DEP] relevant to the single source analysis." (FOF ¶ 15.) Based upon this new information, DEP conducted another review and issued a document titled: "Re-Evaluation of Single Source Analysis" on March 31, 2015, wherein DEP still found the two facilities should be aggregated, albeit on different grounds than its first determination. (FOF ¶¶ 16, 18; R.R. 202a-04a.) In the new analysis, DEP concluded that both facilities have the same SIC code[11] and that the facilities are contiguous or adjacent, comporting with the common sense notion of a plant. (R.R. at 203a.) With regard to the requirement that the facilities be under **common control**, DEP reasoned:

> Common control can be evaluated based on (1) ownership, (2) a contract/contract for service relationship or (3) a support/dependency relationship.
>
> [DEP]'s October 6, 2012, guidance document provides that:
>
>> common control is determined on a case-by-case basis and is guided by the general definition of control used by the Securities and Exchange Commission ("SEC"). The **SEC defines "control**" . . . as the possession, direct or indirect, of the **power to direct or cause the direction of management and policies of a person**, whether through ownership of voting securities, by contract, or otherwise.
>
> Common control can be established by ownership. In response to the information provided by NFG [Midstream] and Seneca to [DEP] on February 27, 2015, [DEP] undertook a more rigorous analysis of the corporate relationships among [Trout Run], Seneca [], and [NFGC].

---

[11] Trout Run agreed to change the SIC code for the Bodine Compression Station from 4922 to 1311 as part of its settlement negotiations with DEP. (R.R. at 59a.)

9

The information available to [DEP] indicates that: 1) **a number of executive officers are shared** among the three corporate entities; 2) **[NFGC]'s operations are integrated to such an extent that its different branches are more like different sections of one organization, as opposed to entirely separate organizations**; and 3) **[NFGC] owns 100% of both Seneca [] and [Trout Run]**.

The totality of the circumstances in this case supports [DEP]'s conclusion that those corporate relationships fulfill the SEC definition of "control," and that, consequently, the activities at Bodine and Well Pad E are under common control. This conclusion precludes the need to consider whether common control exists under a contract/contract for service or support/dependency relationship.

(Id. at 203a-04a (emphasis added) (second alteration in original).) Finding all three prongs of the single source test satisfied, DEP again concluded that "Bodine and Well Pad E must be treated as a single source; meaning, their air contaminant emissions must be aggregated." (Id.)

Unsatisfied with the reevaluation conducted by DEP, Petitioners continued with their appeal before the EHB. After extensive discovery, the parties filed a joint stipulation of facts. (R.R. at 959a-63a.) The EHB then held three days of evidentiary hearings to address factual matters for which there was no stipulation.[12] The testimony presented to the EHB primarily addressed: (1) how DEP made its

---

[12] The EHB heard testimony from John Twardowski, the DEP employee who conducted both the initial 2013 and revised 2015 single source analysis associated with Trout Run's GP-5 permit; James Welch, the finance manager for NFG Midstream; Douglas Kepler, Vice President of Environmental Management at Seneca; David Shimmel, an Environmental Engineer Manager with DEP; Muhammad Zaman, the Environmental Program Manager for DEP's Air Quality Program; Michael Clinger, the Manager of Project Engineering with Seneca; and David Bauer, an employee of NFGC and a corporate officer/treasurer of various NFCG subsidiaries, including NFG Midstream and Seneca. Mr. Bauer may also be an officer of Trout Run, but he testified that he was not sure. (R.R. at 173a.) In addition, the deposition testimony of Krishnan Ramamurthy, DEP's Chief of the Division of Permits, was admitted into evidence. (Id. at 297a-332a.)

decision to aggregate the facilities; (2) the characteristics of Well Pad E and the Bodine Compressor Station; and (3) the corporate structure of NFGC and its subsidiaries, including Trout Run, NFG Midstream, and Seneca. Based on the testimony, exhibits, and joint stipulations, the EHB found the following facts relevant to determining whether there was common control:

31. Well Pad E and the Bodine Compressor Station facility do not share common workforces, plant managers or security forces.

32. Well Pad E and the Bodine Compressor Station facility lack a common secure perimeter, common work rules, coordinated operations, common safety requirements, or process equipment.

33. [NFG Midstream] subsidiaries and Seneca do not share purchasing functions, personnel services, benefit plans, maintenance responsibilities, environmental compliance or remediation responsibilities.

34. Neither Seneca nor its employees have the authority to enter [NFG] Midstream's facility sites without permission.

35. [NFG] Midstream employees do not have the authority to enter Seneca's exploration and production facilities without permission.

36. The Bodine Compressor Station facility and Well Pad E are unmanned facilities.

37. The persons who maintain and service the Bodine Compressor Station are third party contractors retained and directed by [NFG] Midstream.

. . . .

41. Seneca is a Pennsylvania corporation established in 1913.

. . . .

43. Seneca is a wholly-owned subsidiary of [NFGC], a publicly traded holding company organized under the laws of the State of New Jersey.

44. [Trout Run] is a Pennsylvania limited liability company established in 2010.

45. [NFG Midstream] is a Pennsylvania corporation established in 2008.

46. [Trout Run] is a subsidiary of NFG Midstream.

. . . .

49. NFG Midstream is a wholly-owned subsidiary of [NFGC].

. . . .

53. Ronald Tanski is the Chief Executive Officer of [NFGC] and the Chairman of the Board for both NFG Midstream and Seneca.

54. David Bauer is the Treasurer for [NFGC], NFG Midstream and Seneca.

55. [NFGC] does not engage in the day-to-day operation of NFG Midstream or its subsidiaries.

56. [NFGC] does not engage in the day-to-day operation of Seneca.

57. Ronald Tanski and David Bauer, on behalf of [NFGC], are responsible for reviewing and approving the final budgets and business plans of both Seneca and NFG Midstream.

58. [NFGC] presents consolidated financial statements which incorporate the financial statements of its subsidiaries, including Seneca, NFG Midstream and []Trout Run.

59. [NFGC] files a consolidated tax return that reflects the revenues and expenses of its subsidiaries, including Seneca, NFG Midstream and []Trout Run.

60. In order to pay dividends and interest on its debt, [NFGC] relies on interest and dividend payments from its 100% owned subsidiaries, including Seneca, NFG Midstream and []Trout Run.

61. All of the funding for the operations of [NFGC]'s subsidiaries is conducted at the parent company level.

62. Seneca and NFG Midstream do not independently issue their own loans.

63. The assets of Seneca and NFG Midstream are assets of [NFGC].

64. The air contamination sources at issue in this case are considered to be part of [NFGC]'s net investment in property, plant and equipment.

(FOF ¶¶ 31-37, 41, 43-46, 49, 53-64 (citations omitted).)

Based upon the above findings, the EHB concluded that each prong of the three-part single source test was satisfied and that "the Bodine Compressor Station and Well Pad E **satisfy the common sense notion of a plant** and **reasonably constitute a 'facility'** as that term is used in the statutes and regulations." (EHB Adjudication at 19 (emphasis added).) In reaching its conclusion, the EHB refused to give DEP's Guidance document deference because DEP has been inconsistent with its interpretation of the requirements and also found federal guidance "not dispositive." (Id. at 17-18.)

With regard to the second prong of the single source analysis – common control – the **EHB rejected DEP's apparent reliance on common ownership alone** as sufficient to establish common control. It cautioned:

> it is not the mere presence of a common ownership interest that demonstrates the necessary control. There must be sufficient information to demonstrate that the common owner has **the power to influence or direct** the behavior of the entities or the course of events that are relevant to the single source determination.

13

(Id. at 29 (emphasis added).)

The EHB found "[t]he analysis should include the broader issue of **who controls or has the ability to control preconstruction and construction decisions as well as who controls or has the ability to control the ongoing operation of the air contamination sources** at the Bodine Compressor Station and Well Pad E."  (Id. at 28 (emphasis added).)  It concluded that the plain meaning of "control" should govern and derived its definition from the Oxford English Dictionary, which "defines 'control' as 'the power to influence or direct people's behavior or the course of events,'" instead of using the SEC definition of "control" that DEP utilized.  (Id. at 29 (quoting Oxford English Dictionaries online, https://en.oxforddictionaries.com/definition/us/control (last visited May 10, 2017)).)

With the above cited principles in mind, the EHB concluded that NFGC had **the power to influence or control** the behavior of NFG Midstream and Seneca "[b]ecause [NFG] Midstream and Seneca are both **wholly-owned subsidiaries** of [NFGC] and [NFGC] exercises ultimate financial control over both subsidiaries[; therefore,] [NFG] Midstream and Seneca are under 'common control.'"  (EHB Adjudication, Conclusions of Law (COL) ¶ 9.)  The EHB supported its conclusion that NFGC had the requisite control over both operations as follows:

> The testimony in this case makes it evident that [NFGC]'s control of [NFG] Midstream and Seneca arises at least in part from the **power of the purse**. [DEP] called Mr. David Bauer as a witness at the hearing.  Mr. Bauer is the Treasurer for [NFGC], [NFG] Midstream and Seneca.  He testified extensively about the financial relationship between the three entities.  [NFGC] owns 100% of the stock of [NFG] Midstream and 100% of the stock of Seneca.  Mr. Bauer explained that [NFG] Midstream and Seneca implement their own budgets, but those budgets are subject to review by himself and Mr. Ron Tanski, [NFGC]'s CEO, at annual meetings with the

14

subsidiaries. [DEP] questioned Mr. Bauer about whether he and Mr. Tanski had veto power or final say over the budgets of [NFG] Midstream and Seneca. Mr. Bauer stated that if there are any disagreements with the proposed budgets presented by [NFG] Midstream and Seneca, he and the President of the subsidiary would reach an understanding on the budget issue and proceed on that basis. In addition to questions about budgets, Mr. Bauer was asked about his role in the selection of projects or capital investments by Seneca and [NFG] Midstream. Mr. Bauer stated that the process for deciding on which projects to support with capital investments is similar to the budget process. As described by Mr. Bauer, Seneca would develop and submit a business plan to Mr. Bauer and Mr. Tanski for review and based on their assessment of the plan, Mr. Bauer and Mr. Tanski would determine whether [NFGC] wanted to commit capital to that business. The same process would be followed in reviewing a business plan for [NFG] Midstream.

It is clear from Mr. Bauer's testimony that [NFGC], through the financial arrangements with its subsidiaries, [NFG] Midstream and Seneca, has the **power to influence** the behavior and/or course of events of both [NFG] Midstream and Seneca vis-à-vis the Bodine Compressor Station and Well Pad E. **While the issue was not as fully developed as we would have liked, we have no doubt that the initial construction of both Well Pad E and the Bodine Compressor Station, including all of the air contamination sources located at these sites, would have been subject to the budget and business plan process discussed by Mr. Bauer in his testimony**. [NFGC]'s **ability to influence** the preconstruction and construction decisions that are part of the GP-5 permitting and the PSD and [N]NSR programs is the type of control/common control that satisfies the requirements of this part of the three part test. **Although the evidence at the hearing demonstrated that [NFGC] does not take an active role in day-to-day operations, we also believe that based on its involvement with the financial arrangements of [NFG] Midstream and Seneca, it could play a more active role in those operations if it so chooses**. That too would satisfy our understanding of control since **it is the possession of the power to influence or direct the behavior of the parties or the course of events, not the actual exercise of that power that satisfies the requirement for common control**.

15

(Id. at 29-31 (emphasis added).)[13]

The EHB did not consider EPA's concept that the facilities together should form a "common sense notion of a plant." Instead, the EHB noted that "[t]he idea of the common sense notion of a plant . . . arose out of the [United States Court of Appeals for the District of Columbia] Circuit's decision in Alabama Power" and, while discussed in a preamble to EPA's August 1980 PSD regulations, it "never made it directly in to any of the relevant statutes and regulations and is not a specific part of the three part regulatory test." (EHB Adjudication at 37.) According to the EHB:

> We remain skeptical about importing concepts and discussion from regulatory preambles and giving them equal weight with the actual language of the properly promulgated regulations.[] We agree with the [DEP] that the proper way to think about the common sense notion of the plant is in the context of the requirements of each of the three parts of the regulatory test and the overall definition of a stationary source. As discussed above, we have found that Well Pad E and the Bodine Compressor Station are within the same industrial grouping, under common control, and adjacent to each other; therefore, they collectively satisfy the regulatory definition of a "facility." We do not find the fact that the Bodine Compressor Station and Well Pad E fail to share a "secure perimeter, security, work rules, coordinated operations, safety requirements, overall management and process equipment that is proximately located and arranged to produce products," is a proper basis to override the regulatory criteria. These common characteristics of a plant do not readily translate to the types of facilities found in oil and gas field operations and, therefore, their absence is not particularly meaningful to our understanding of the common sense notion of a plant in this context.

---

[13] Because the EHB disposed of the second prong of the single source analysis test as it did, it was not required to address the other two approaches – existence of a service contract and a support/dependency relationship – relied upon by DEP in its two determinations. However, in a footnote, the EHB found neither approach would have supported a finding of common control. (EHB Adjudication at 31 n.3.)

16

(Id. at 37-38 (footnote omitted).) The EHB further stated: "Even if we were to elevate the concept of a common sense notion of a plant to a stand-alone test, we think the facts support that the Bodine Compressor Station and Well Pad E satisfy the common sense notion of a plant." (Id. at 38.) The EHB did not offer any explanation as to why the test would be satisfied.

Writing separately, Judge Bernard A. Labuskes, Jr., stated he concurred with the result but questioned who exactly should be included and covered by the permit. (EHB Adjudication at 42-46 (Labuskes, J., concurring).)[14] He appeared to struggle with how a permit issued to one party could aggregate a second source, which was exempt from permitting. (Id. at 43 ("I am not sure how this plays out, but if the two parts of the single source cannot or should not be included in the permit, why are their emissions being aggregated? Either they constitute a single source or they do not.").) He seemed to foresee potential issues with enforcement, writing:

> By including only part of the single source in the permit, [DEP] has created a rather odd situation. The permittee's activities in general and emissions in particular going forward will now in part be constrained by the emissions and activities of a party that is **not subject to or controlled by the permit – Seneca**. The third party's emissions and activities are **beyond the scope of the permit**, yet those emissions and activities directly affect the permittee. Indeed, **Seneca, who would otherwise be exempt, is now effectively being regulated indirectly by a permit. The permittee has no direct control over the third party**, so the parent of the permittee, which is not a permittee itself, must apparently control the third party for the benefit of the permittee. If the parent does not do that, will the parent be subject to enforcement action? Since the parent is not a permittee,

---

[14] In his concurring opinion, Judge Richard P. Mather, Sr., expressed concern about not deferring to DEP's expertise when interpreting the term "common control." (EHB Adjudication at 47-51 (Mather, J., concurring).)

presumably attempting to enforce the permit against it would require piercing the corporate veil, which is very difficult to do. [DEP] has placed the compressor station and the well pad in the same bubble for a disembodied aggregation analysis but popped that bubble for what really matters – the permit.

(Id. at 43-44 (emphasis added).)

## III.    Petitioners' Appeal

Petitioners now petition this Court for review.[15]    The Marcellus Shale Coalition (Amicus Curiae) filed a brief amicus curiae in support of Petitioners.  On appeal to this Court, Petitioners and Amicus Curiae raise four issues.  First, Petitioners argue that the EHB erred in construing the common control test by equating the power to **influence** decisions relevant to a facility's emissions with **control** of a facility.  Second, Petitioners argue that, even assuming the EHB's construction of common control is appropriate, there was no evidence presented showing that NFGC had the power to influence Trout Run or Seneca.  Third, Petitioners argue that the EHB's Order could unlawfully impose obligations and liability on Seneca, who is otherwise exempt from permitting requirements, as well as Trout Run.  Finally, Petitioners contend that the EHB's conclusion that the two facilities fell within the common sense notion of a plant is arbitrary and capricious and rests on an incorrect understanding of the regulatory regime.  We shall address each issue seriatim.

---

[15] This Court's scope of review of an order of the EHB is whether the EHB "committed an error of law or a constitutional violation, or whether any necessary findings of fact are not supported by substantial evidence." Brockway Borough Mun. Auth. v. Dep't of Envtl. Prot., 131 A.3d 578, 585 n.9 (Pa. Cmwlth. 2016) (internal quotation omitted).

18

## A. Common Control

The Clean Air Act imposes requirements over the emissions of stationary sources, and the EPA has defined various terms in the PSD regulations, as has DEP. However, the phrase "common control" is not defined by the Clean Air Act or the APCA or in the PSD regulations. Moreover, the Chief of DEP's Division of Permits admits there are **no DEP regulations** governing the common control analysis; rather, DEP relies on the DEP Guidance document and SEC guidance. (R.R. at 313a.) The DEP Guidance document defines "common control" based upon the SEC's definition of the term "control," which includes the terms "controlling," "controlled by," and "under common control with," as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." (DEP Guidance at 7, R.R. at 211a (citing 17 C.F.R. § 240.12b-2).) This definition is also included in an interpretative rule to EPA's PSD regulations issued on September 11, 1980, but is not in the regulations adopted by Pennsylvania. According to the interpretative rule:

> Control can be a difficult factual determination, involving the power of one business entity to affect the construction decisions or pollution control decisions of another business entity. EPA thought that a simplifying test of control, such as some specified voting share, would serve the interest of the business community, by providing clarity and predictability. Comments on this issue were solicited and suggestions were received. Upon receiving the comments, the [EPA] did not find a convincing argument in favor of any particular, simplified test of control. Some commenters seemed to favor unfettered inquiry into control in each case. Therefore, the [EPA] has decided that determinations of control will be made case-by-case, without benefit of a voting-share test or other simplifying test. However, the [EPA] will be guided by the general definition of control used by the [SEC].

19

45 Fed. Reg. 59,874, 59,878 (Sep. 11, 1980).

While interpretative rules "do not have the force and effect of law," Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 88 (1995), the EPA's regulations governing penalties for non-compliance with the emission limitations provide a nearly identical definition to the SEC definition advanced in the September 11, 1980 interpretative rule. See 40 C.F.R. § 66.3(f) (2015) ("Control (including the terms controlling, controlled by, and under common control with) means the power to direct or cause the direction of the management and policies of a person or organization, whether by the ownership of stock, voting rights, by contract, or otherwise").[16] Because the enforcement regulations found at 40 C.F.R. § 66.3(f) (2015) address the same issues as the PSD regulations found at 40 C.F.R. § 52.21(b)(6) (2015), the regulations are *in pari materia,* and should, if possible, be construed as one regulation. Section 1932 of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1932; see Highway News, Inc. v. Pennsylvania Dep't of Transp., 789 A.2d 802, 808 (Pa. Cmwlth. 2002) (stating that "it is well settled that the rules of statutory construction apply to regulations as well as statutes"); see also Ocean Cnty. Landfill Corp. v. United States Envtl. Prot. Agency, Region II, 631 F.3d 652, 654 n.1 (3d Cir. 2011) (defining common control as used in the single source test through the definition in 40 C.F.R. § 66.3(f)).

---

[16] The EPA's PSD regulations were originally promulgated on June 19, 1978, and were revised on August 7, 1980, in response to the United States Court of Appeals for the District of Columbia's decision in Alabama Power. 45 Fed. Reg. 52,676 (Aug. 7, 1980). The interpretative rule at issue was added a little over a month after the revision, on September 11, 1980. 45 Fed. Reg. 59,874 (Sep. 11, 1980). The EPA's regulation on penalties was promulgated in July 28, 1980, and also took the Alabama Power decision into consideration. 45 Fed. Reg. 50,086, 50,087 (Jul. 28, 1980).

Generally, an administrative agency's interpretation of its own regulations is entitled to deference unless that interpretation is unreasonable. Dep't of Envtl. Prot. v. N. Am. Refractories Co., 791 A.2d 461, 464 (Pa. Cmwlth. 2002) (citations omitted); see also Tire Jockey Serv., Inc. v. Dep't of Envtl. Prot., 915 A.2d 1165, 1186 (Pa. 2007) (stating that "[t]his Court follows a two-step analysis when reviewing an agency's interpretation of its governing regulations: (1) whether the interpretation of the regulation is erroneous or inconsistent with the regulation, and (2) whether the regulation is consistent with the statute under which it was promulgated"). "The task of the reviewing court is limited to determining whether the agency's interpretation is consistent with the regulation and with the statute under which the regulation was promulgated." N. Am. Refractories Co., 791 A.2d at 464.

Here, DEP, in both its original determination and revised determination, primarily relied upon a **common ownership interest** to conclude common control existed. (R.R. at 197a-98a, 203a-04a.) The EHB rejected this approach, cautioning "**the mere presence of a common ownership interest" does not demonstrate control**." (EHB Adjudication at 29.) The EHB did not give DEP's use of the SEC's definition deference because: it viewed the term "control" as unambiguous; the definition used by DEP originated in a preamble[17] to EPA's PSD regulations, not the regulations themselves; and **the definition is derived from the regulation of securities, not pollutants**. (Id. at 25-26.) Instead, the EHB advanced a theory that control exists if a "common owner has **the power to**

---

[17] The EHB describes the interpretative rule issued on September 11, 1980, as a preamble to the August 7, 1980 PSD regulations. The August 7, 1980 regulations contain no preambular language on the SEC definition. It appears the EHB was referring to the September 11, 1980 interpretative rule.

**influence or direct** the behavior of the entities or the course of events that are relevant to the single source determination." (Id. at 29 (emphasis added).)

### 1. Meaning of "Control"

We begin with Petitioners' argument that the EHB's reliance on **influence**, instead of **control**, has no basis in the Clean Air Act and the APCA. Petitioners argue that the EHB's novel "power to influence" standard is vastly different from the concept of "control" as used in the DEP Guidance. Petitioners illustrate their argument by analogy to litigation insofar as a litigant may attempt to **influence** a court by presenting legal argument, but no litigant can actually **control** an independent court. Petitioners argue that in the corporate context, even a single shareholder possesses the power to **influence** a company's decision. Yet, single shareholders do not **control** the corporation; it is only the board of directors of the corporation that is endowed with such power.

From DEP's perspective, the EHB applied the plain and unambiguous language of the regulations to carry out the purposes of the Clean Air Act and APCA. DEP contends that the Board's construction of the term "control" is consistent with the relevant regulations and the **purpose of the APCA**, which is to provide Pennsylvania with **air quality greater than that required by federal law**. Dep't of Envtl. Prot. v. Pennsylvania Power Co., 384 A.2d 273, 284 (Pa. Cmwlth. 1978).

Here, we agree that the "power to influence" standard used by the EHB is different than the "control" standard found in the DEP Guidance, which cites to the SEC definition. In In re Flag Telecom Holdings, Ltd. Securities Litigation, the United States District Court for the Southern District of New York found that

22

although there was "considerable **influence** over 'the direction of the management and policies,'" the allegations in the complaint were insufficient to establish **control** within the meaning of the SEC regulation. 308 F. Supp. 2d 249, 273-74 (S.D.N.Y. 2004) (emphasis added). Contrary to EHB's belief, the term "control" is more than the power to merely influence; it involves the power to **direct**. Notably, even DEP's Chief of the Division of Permits defined control as requiring something more, explaining if "one entity can make the other entity . . . do specific tasks, then basically, they are [*sic*] controlling, to some degree." (R.R. at 326a.) He agreed that if there is no **ability to direct** the other entity to undertake specific tasks, then this was "indicative of a lack of common control." (Id.) Based upon the foregoing, we conclude the EHB erred in using "power to influence," which is a more lax standard.[18]

### 2. Corporate Governance Standards

We next turn to Petitioners' argument that the EHB's and DEP's analysis of common control disregards long-standing principles of corporate governance. The power to manage a subsidiary, according to Petitioners, is in its board of directors not its parent corporation, and the directors have a legal duty to act in the best interest of the subsidiary, not the parent.[19] Relying on United States v. Bestfoods,

---

[18] Although we believe the EHB erred in utilizing the "power to influence" as the equivalent of "control," we agree with the EHB that DEP's reliance on common ownership alone is also insufficient to demonstrate "common control," as discussed *infra*.

[19] We have referred to Trout Run and Seneca as subsidiaries and NFGC as the parent but in reality the relationship is more complex. Seneca is a wholly-owned subsidiary of NFGC, but Trout Run is a wholly-owned subsidiary of NFG Midstream, which is a wholly-owned subsidiary of NFGC, making Trout Run an indirect subsidiary of NFGC. While, on its face, this may seem like a distinction without a difference, in reality, the distinction adds another layer of corporate governance and accompanying fiduciary duties to the equation. Although we continue to refer to **(Footnote continued on next page…)**

23

524 U.S. 51 (1998), Petitioners argue that if DEP wanted to show common control, it needed to either pierce the corporate veil by showing that the two subsidiaries are the alter ego of the parent or show NFGC's direct involvement in the operations of Well Pad E and the Bodine Compressor Station. DEP, according to Petitioners, did neither.

Amicus Curiae argues that allowing the EHB's interpretation of "control" to stand would "lead to the demise of corporate law" because the "test would become the exception that swallows the rule, ensnaring entire corporate family structures based solely on their status as a corporate parent." (Amicus Curiae's Br. at 26.) Amicus Curiae takes a broad view of the impacts of the EHB Adjudication and notes that by its very nature, natural gas extraction requires multiple facilities within a close proximity.[20] According to Amicus Curiae, the EHB's Adjudication would require each operator of an emitting facility to not only know its own equipment and emissions, but also the equipment and emissions of facilities owned and operated by other independent corporations operating under a single corporate umbrella.

---

**(continued…)**

Trout Run and Seneca as subsidiaries and NFGC as the parent as a matter of convenience, we are cognizant of the true relationships, and the distinction is not lost in our analysis.

[20] In response to Amicus Curiae's Brief, DEP asks this Court to Strike Section IV of the Amicus Brief and its attached exhibits. We will grant this Application in part and deny it in part. Because this Court cannot consider evidence that was never made part of the official record, we will strike the exhibits attached to Amicus' Brief. Banfield v. Cortés, 110 A.3d 155, 172 n.14 (Pa. 2015). However, we will not strike Section IV of Amicus Curiae's Brief, as it addresses an issue raised by the parties – the impact of the EHB's aggregation analysis in practice – but distinguishes itself from the briefs of the parties by reflecting an industry-wide perspective. See Rule 531(a) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 531(a) (defining "amicus curiae" as "a non-party interested in the questions involved in any matter pending in an appellate court").

DEP responds that there is no need to pierce the corporate veil in this matter, as corporate veil piercing is implicated only when a parent corporation is held **liable** for the actions of its subsidiaries. DEP asserts that, unlike the District Court's decision under review by the United States Supreme Court in <u>Bestfoods</u>, the EHB's Adjudication does not impose any such liability on either NFGC or either subsidiary. Thus, DEP views the EHB's approach of looking to the "power of the purse" as consistent with, and serving the purposes of, the APCA.

In <u>Bestfoods</u>, the United States Supreme Court interpreted a provision in the Comprehensive Environmental Response, Compensation, and Liability Act[21] (CERCLA) that imposes liability on a polluter for the costs of cleaning up hazardous substances. <u>Bestfoods</u>, 524 U.S. at 65. CERCLA imposes liability on "any person who at the time of disposal of any hazardous substance **owned or operated** any facility at which such hazardous substances were disposed of." Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2) (emphasis added). The Court found that if CERCLA imposed liability only on owners, and the subsidiary owned the site on paper, the parent could not be liable without piercing the corporate veil. <u>Bestfoods</u>, 524 U.S. at 63-65. This is because a statute can abrogate common law principles only if it speaks directly to the issue, and CERCLA is silent on the implications of corporate ownership on liability for remediation costs. <u>Id.</u> at 62-63. However, by placing liability on **both** owners and operators, CERCLA imposes both derivative liability on parents if the corporate veil is pierced under the ownership provision and direct liability for the parent's own actions, if it operates the facility, under the operator provision. <u>Id.</u> at 65. Direct liability under CERCLA is determined by considering "whether, in degree

---

[21] 42 U.S.C. §§ 9601-9675.

and detail, actions directed to the facility by an agent of the parent alone are **eccentric under accepted norms of parental oversight of a subsidiary's facility**." Id. at 72 (emphasis added). Because the only evidence presented in Bestfoods to show that the parent operated the site was that the directors of the parent served as the directors of the subsidiary, the United States Supreme Court held that the evidence was insufficient to support liability. Id. at 69-70.

Petitioners and Amicus argue that Bestfoods directly controls our inquiry on common control. They argue there is no difference between imposing liability and imposing permit obligations because "[t]he receipt of any permit involves the assumption of liability for violating its terms." (NFG Midstream's Reply Br. at 17.) NFG Midstream argues Trout Run's GP-5 permit **requires** Trout Run to monitor Seneca's emissions and to compel Seneca to comply with the terms of the permit, which it has no ability to do. Because violations of the GP-5 permit can carry significant criminal and civil penalties, NFG Midstream argues that Trout Run could be placed in the difficult position of being subject to fines for activities beyond its control. Seneca similarly argues that its well pad operations are exempt from permitting requirements under the APCA because Well Pad E is covered by Exemption No. 38. (R.R. at 42a; EHB Adjudication at 43 (Labuskes, J., concurring).) DEP's action removes this exemption and could expose Seneca to penalties based on the activities of Trout Run.

We agree that the **receipt of a permit does require compliance with the permit**, including suffering whatever consequences result from noncompliance. See, e.g., 40 C.F.R. § 52.21(j)-(r) (detailing obligations and responsibilities under the Clean Air Act). Although aggregation for purposes of permitting does not **directly** impose liability on the sources aggregated, it does so **indirectly**.

26

Generally, a corporation is considered a separate and distinct legal entity, even if its stock is owned entirely by one person. Lumax Indus., Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995). DEP's single source determination abrogates this general rule because DEP essentially is holding the permittee liable for the acts and/or omissions of a related corporation, Seneca, which we emphasize is exempt from permitting, simply because of their relationship with NFGC. DEP's action here is designed to limit the emissions of the Bodine Compressor Station by setting an emission threshold based upon the aggregate emissions of Trout Run's Bodine Compressor Station and Seneca's Well Pad E. Thus, DEP is requiring an emission source owned by one company to be bound by a permit that includes the emissions of another corporation, even though that corporation is otherwise exempt from permitting requirements. Because the permitting and enforcement provisions are *in pari materia* and should be read together, 1 Pa. C.S. § 1932, the same standard should apply to both, particularly when the issuance of the permit imposed obligations that, if not complied with, could lead to enforcement consequences.

Furthermore, like CERCLA, the Clean Air Act and APCA impose liability on owners and operators but are otherwise silent on the implications of corporate ownership on liability. Therefore, as the Supreme Court explained in Bestfoods, in the absence of such statutory direction, common law principles, such as piercing the corporate veil, are not abrogated. Bestfoods, 524 U.S. at 61-63. There is some element of general control inherent in any parent-subsidiary corporation relationship, but the courts have recognized "the longstanding rule of limited liability in the corporate context remains the background norm." Lansford-Coaldale Joint Water Auth. v. Tonolli Corp., 4 F.3d 1209, 1221 (3d Cir. 1993).

27

Under the facts of this case, **where one facility is exempt** from permitting requirements, but its emissions are still being aggregated with another facility for purposes of that facility's permit, DEP is required to either demonstrate NFGC's direct involvement in the operations of Well Pad E and the Bodine Compressor Station or pierce the corporate veil by showing that the two entities are the alter ego of one another or their parent. This approach is in accordance with well-settled corporate law principles and consistent with case law imposing liability for environmental violations discussed above. Furthermore, such an approach addresses the genuine concern, which we share, that was first expressed by Judge Labuskes in his concurring opinion concerning the effect of aggregating an exempt source with a non-exempt one and the enforcement problems that would undoubtedly ensue as a result. Here, neither the EHB with its "power to influence" standard nor DEP with its simple common ownership standard utilized the correct standard when analyzing whether common control existed under these circumstances. Finding this to be error, we vacate EHB's Order and remand for the EHB to apply the correct standard.[22]

---

[22] Instead of remanding for further proceedings, Petitioners urge this Court to resolve the matter based upon the existing record, which they consider to be fully developed. We agree that the EHB has already made extensive factual findings, but the EHB should be afforded the opportunity to apply the appropriate standard based upon our guidance first. The EHB is the fact-finder, and we cannot usurp that authority. Furthermore, we note that there are no explicit credibility determinations, and we are hesitant to imply any. Therefore, we decline to resolve this matter based upon the existing record and instead vacate the Order and remand the matter to the EHB for further proceedings consistent with this opinion.

## B.    Common Sense Notion of a Plant

Petitioners next argue that the Bodine Compressor Station and Well Pad E, when examined together, fail to meet the "common sense notion of a plant" standard, and as such, the emissions of the two facilities cannot be aggregated.  In Petitioners' view, the requirement serves as "the anchor of the PSD's definition of a 'stationary source,'" or the "overarching federal standard," and must be established as a prerequisite for aggregation of emission sources for permitting purposes.  (NFG Midstream's Br. at 47; NFG Midstream's Reply Br. at 25.) Petitioners consider the EHB's main error in this regard is considering the common sense notion of a plant requirement superfluous.  Petitioners argue that under a correct understanding of the concept of a common sense notion of a plant, the EHB's Order must be reversed based on the EHB's own findings of fact.

DEP argues that the common sense notion of a plant concept "is not a statutory requirement and has not been properly promulgated as part of a regulation."  (DEP's Br. at 37.)  Because the concept derives from EPA's preamble to its August 1980 regulations, and because Petitioners do not argue that any part of the three-part single source test is ambiguous, the preambular language may not be used as an interpretive tool.

In its Adjudication, the EHB agreed with DEP, stating it was "skeptical of importing concepts and discussion from regulatory preambles and giving them equal weight with the actual language of the properly promulgated regulations." (EHB Adjudication at 37.)  Regardless, the EHB stated that even if the concept of a common sense notion of a plant was elevated to a stand-alone test, as Petitioners urge, "the facts support that the Bodine Compressor Station and Well Pad E satisfy the common sense notion of a plant."  (Id. at 38.)

A preamble may be considered in construing a regulation if an ambiguity exists. See UMCO Energy, Inc. v. Dep't of Envtl. Prot., 938 A.2d 530, 537 (Pa. Cmwlth. 2007). "However, preambles may not be used to create ambiguity where none exists, and in any case where a preamble is used as a tool to resolve an ambiguous [regulation], the preamble is not controlling." Id. (citing English v. Commonwealth, 816 A.2d 382, 387 (Pa. Cmwlth. 2003)). Here, there is no ambiguity in the regulations, and Petitioners do not argue such an ambiguity exists. Instead, they argue "common sense notion of plant" is a separate concept that also must be satisfied, in addition to the three regulatory requirements.

We agree with Petitioners that "common sense notion of plant" is an overarching principle but disagree that it is a separate, standalone test. Rather, if the three prongs of the regulations – commonality of SIC codes, adjacency or contiguousness, and common control – are each met, the facilities will also satisfy the meaning of "common sense notion of plant." This is consistent with the Chief of the Division of Permits' understanding of the concept. As he stated, "It's not creating a separate prong, necessarily. It's just an umbrella term to tie all the pieces together, whether the two operations are functionally operating as a single operation." (R.R. at 326a).

Here, the EHB was correct that "common sense notion of plant" is not a separate requirement, but because it applied the incorrect standard to determine whether common control existed, one of the regulatory requirements to aggregate, it is not possible to determine whether the concept of "common sense notion of plant" is met. If, on remand, the EHB finds common control exists, thus satisfying the final element set forth in the regulations, then a "common sense notion of plant" necessarily exists. However, if common control, or any of the other prongs,

30

are not satisfied, then the two facilities cannot meet the definition of "common sense notion of plant."

## IV.    Conclusion

Having concluded that both DEP and the EHB wrongly interpreted the term "common control" as used in the applicable regulations, we are compelled to vacate the Order of the EHB and remand this matter to the EHB for further proceedings consistent with this Opinion.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

National Fuel Gas Midstream       :
Corporation and NFG Midstream     :
Trout Run, LLC,                   :
                    Petitioners   :
                                  :
            v.                    :   No. 116 C.D. 2016
                                  :
Pennsylvania Department of        :
Environmental Protection,         :
                    Respondent    :
                                  :
Seneca Resources Corporation,     :
                    Petitioner    :
                                  :
            v.                    :   No. 195 C.D. 2016
                                  :
Pennsylvania Department of        :
Environmental Protection,         :
                    Respondent    :

# **O R D E R**

NOW, June 2, 2017, the Order of the Environmental Hearing Board in the above-captioned matter is **VACATED**, and this matter is **REMANDED** for further proceedings consistent with the foregoing Opinion.

The Pennsylvania Department of Environmental Protection's Application to Strike is **GRANTED** in part and **DENIED** in part. The attachments to the brief Amicus Curiae submitted by the Marcellus Shale Coalition are stricken from the brief.

Jurisdiction relinquished.

            _____
            **RENÉE COHN JUBELIRER,** Judge